THOMPSON, J.
 

 This is a suit for damages resulting from an alleged libelous and defamatory publication. The defendant admits the publication, but denies that it constitutes a libel, alleges good faith and want of malice, and that plaintiff has suffered no damage.
 

 There was judgment rejecting the plaintiff's demand, and -he has appealed.
 

 The publication said to be libelous reads as ■follows:
 

 “Mutilated Court Papers Will Not Save Murderers
 

 “Certified Copies in Vaults of High Tribunal Comply With Law.
 

 “Six Italians in the Parish Prison under sentence of death for the murder of Dallas Calmes at Amite three years ago will not have the date of execution indefinitely postponed, as reports from Hammond indicated Monday. The Hammond story related that because records of lower court had been mutilated, the original papers in the case or certified copies could not be presented to Governor Parker so the death warrant could be signed.
 

 “T. Simmes Walmsley, assistant attorney general, declared that the certified copies of the transcript of evidence' in both tribunals of the accused men are now in the state supreme court’s vault and extraordinary precautions are being taken to protect those records.
 

 “The certified copies of the records sent to the supreme court were not returned to Amite, Mr. Walmsley explained. And since under the law the governor must have the transcript of evidence or certified copies before him when he signs the death decrees, the records of the supreme court will suffice.
 

 “District Attorney Allen at Hammond is SRid to have discovered that the original papers had been cut up by a Mrs. Morrison, a deputy clerk of court, upon instructions from counsel and the clerk of court.”
 

 It appears that the information on which the foregoing story was written and published came to the paper through the mails. It •purported to come from the defendant’s correspondent at Hammond and was written on stationery furnished, by the Times-Picayune to its correspondents.
 

 On investigation the Times-Picayune ascertained that the correspondent’s name had been forged: that the story was false and had not been sent by defendant’s correspondent.
 

 On the following day the defendant printed on the front page of its country edition the following from Hammond, concluding with the editor’s note.
 

 “Reports Intact in Case of Six Calmes’ Slayers.
 

 “Report of Mutilation Proves Forgery and is Corrected.
 

 “Hammond, La. Feb. 19. — Publication of the article in today’s Times-Picayune to the effect that there had been a mutilation of the records in the clerk of court’s office of the case of the six Italians charged with the murder of Dallas Calmes, caused much comment.
 

 “B. M. I-Iavard, correspondent for the paper at I-Iammond, stated that he did not send in the dispatch and knew nothing whatever regarding it.
 

 
 *1130
 
 “Clerk of Court N. A. Sauciers declared that tile statement in the article to the effect that there had been a mutilation of the records in his office was false.
 

 “Henry Habig who is opposing Mr. Sanders for Clerk of Court, said he had no knowledge whatever of the matter.
 

 “Mr. Sanders was highly incensed about the article, as was also his chief deputy, Mrs. Morrison.”
 

 “Editor’s Note: The report on which the article was based was printed in good faith, having been received by mail from Hammond signed ‘Havard’ and the forgery of the Times-Picayune correspondent’s name was detected too'late to prevent its appearance. The correction is cheerfully made and efforts to identify the forger are under way.
 

 “George Campbell, editor of the Hammond Vindicator, who resigned as Times-Picayune correspondent some months ago, likewise assures us that he did not send the message, which imposed upon this newspaper.”
 

 It so happened that the publication of the story complained of occurred on the day of the second primary election for all state and parish offices in February, 1924. The plaintiff was a candidate for clerk of court of Tangipahoa parish at said election, and he charges in his petition that the publication was made for the purpose of injuring him with the public at large, especiálly with the voters, and to annoy, defame and prevent him from being re-elected to the office of clerk of court.
 

 This accusation is not sustained by the record. The story had no relation to nor connection with the election whatever. The publication was based on a rumor which had been put in circulation in the parish of Tangipahoa concerning six Italians who were then in the irarish prison under sentence of death.
 

 It is doubtless true that the story had been put in circulation in the parish by persons who were opposed to the election of the plaintiff: and with the view of injuring the plaintiff.
 

 And it may be true also that the sending of the story to the defendant for publication was actuated by the same motive.
 

 But the publication by the defendant was not inspired by any such motive, and the article on its face shows this to be true.
 

 The article was written after information had been obtained from the Attorney General’s office to the effect that copies of the transcript were on file in the Supreme Court.
 

 The manifest purpose of the publication as shown by the heading and the entire article, with the exception of the last paragraph, was to advise the public that the execution of the six Italians would not be postponed, even though the report that the records in the lower court had been mutilated was true.
 

 The publication on the day of election was a mere coincidehce. If the story had been furnished the newspaper on any other day, it would have been published just the same.
 

 We have no difficulty therefore in acquitting the defendant of the charge of intentionally and designedly attempting to influence the voters of Tangipahoa parish against the plaintiff in the pending election, or to impair the good name and reputation, personally and officially, which he enjoyed in the parish which had honored him.
 

 The substantial majority which he obtained over his opponent shows that neither the original report put in circulation by plaintiff’s political opponents, nor the publication complained of, had any - material effect on the election.
 

 Nor do we find from the record any actual malice on the part of those connected with the newspaper who were responsible for writing and publishing the story.
 

 
 *1132
 
 Of course, where a publication is false and libelous on its face, actual malice or ill will is not required to be established. The law in such a case implies malice. This legal proposition will hardly be questioned.
 

 The publication- here in question did not charge that the plaintiff had mutilated' the court records relating to the six Italians. It merely gave currency to a report already in circulation in the parish of Tangipahoa, and particularly in the town of Hammond, that the original papers had been cut up by Mrs. Morrison, a deputy clerk of court, upon instructions from counsel and the clerk of court.
 

 Having reached the conclusion that the publication was not made from any evil or vindictive motive, we come directly to the question as to whether the publication as -a matter of law amounts to a libel.
 

 .No one, we apprehend, would contend that the first three paragraphs of the article in question constitutes a libel. In neither of these paragraphs is there an intimation or suggestion that the clerk of court was responsible or had anything to do with the alleged and reported mutilation of -the records. The most that can be said is that currency was given to a report that because records had been mutilated the execution of certain parties would be postponed. If there be libel at all, it must be found in the fourth or last paragraph of the publication, - which states that District Attorney Allen at Hammond is said to have discovered that the original papers had been cut up by a Mrs. Morrison, a deputy clerk of court, upon instructions from counsel and the clerk of court.
 

 We are constrained to hold that the language used in this paragraph amounts in law to a libel upon the good name of the plaintiff. He is diieetly charged on the asserted report or statement of a law officer with having caused his deputy to cut up or destroy the public records in his office and under his control and keeping. If the charge were true, the plaintiff would be guilty of a felony under Act No. 8 of the Extra Session of the Legislature of 1870.
 

 The principle is well settled that it is libelous to falsely impute to another or to falsely charge another with the commission of a felony.
 

 And it is no defense to say that the defendant did not originate the libel. In giving currency to slanderous and libelous reports and publications, a party is as much responsible criminally and civilly as if he had originated the defamation. McClure v. McMartin, 104 La. 507, 29 So. 227, and authorities there cited.
 

 “Every person has a right to enjoy that degree of respect, good will, and social or business distinction to which his own acts, and his social or business habits, entitle him; and anyone who unlawfully interferes with this, right, by circulating slanderous reports, renders himself liable for consequent damages.” Savoie v. Scanlan, 43 La. Ann. 967, 9 So. 916, 919, 26 Am. St. Rep. 200.
 

 Here an accusation, false and unfounded, had been originated in the parish of Tangipahoa. The story was communicated to the defendant, which gave it publicity, and while we exonerate the defendant from any im¿ proper motive, we must hold that the defendant, who was undoubtedly imposed upon, did not exercise that care and caution which it should have done to ascertain whether the report was true or not.
 

 The story as communicated to the defendant was of such a nature and character as to demand an inquiry as to its truth or falsity before vending it to the public.
 

 As to the amount of the damages, under
 
 *1134
 
 the circumstances, we are frank to say that only a very limited, amount can be allowed. As we have already said, the defendant was elected clerk of court by a substantial majority. The story as published was corrected the next day and the correction was given wide publicity. We feel quite sure from all of the evidence that the plaintiff’s apprehension that he will feel the injurious effects of the publication in his future political ambition is very largely overdrawn.
 

 The plaintiff himself was not able to testify to any real and actual damage in any amount in excess of $14.
 

 There is no place for punitive or exemplary damages in this case, even if that character of damages were assessable in any civil action.
 

 We have concluded to fix the amount of damages at $50.
 

 It is therefore ordered that the judgment appealed from be set aside and that the plaintiff have judgment against the defendant for the sum of $50 with 5 per cent, per annum interest from judicial demand (March 19, 1924) till paid, and that defendant pay costs of this suit.