[No. 29115. Department Two. December 10, 1943.]

STEPHEN V. CAREY, *Respondent,* v. HEARST PUBLICATIONS, INC., *et al., Appellants.*[1]

[1]Reported in 143 P. (2d) 857.

*Tanner, Garvin & Ashley,* for appellants.

*Tracy E. Griffin* and *John D. Carmody,* for respondent.

BLAKE, J.—This is an appeal by defendants from a judgment entered on a verdict in favor of plaintiff in a libel suit. The action arose out of the following story which appeared in the early editions of the Seattle Post-Intelligencer of November 5, 1941:

"SCHWELLENBACH RAPS ATTORNEY
"SPOKANE, Nov. 4.—(AP)—Attorney S. H. Carey of Seattle was criticized severely today by Judge Lewis Schwellenbach.

"Carey, attorney for the American Fruit Growers, Inc., was testifying in the case whereby the Bank of California is seeking to recover $65,000 which it advanced to the Columbia Agricultural Credit Corporation of Wenatchee in 1937.

"The bank claims that the Northwest Fruit Exchange, an American Fruit Growers' subsidiary, sold fruit mortgaged to the Columbia Credit and turned money over to producers illegally without satisfying the mortgage.

"Carey in answering a stipulated group of questions concerning officers of the credit corporation, who were also employes of the fruit company and Northwest Exchange, denied the credit company officers were paid for work done for the credit company and were paid by the fruit company and Northwest Exchange only 'for services rendered those companies.'

"After the same reply had been made several times, Judge Schwellenbach interrupted to question sharply:

" 'Do you mean to say they worked for the Columbia Credit Corporation for charity? Were they just working for the community?'

" 'It was in a sense a civic duty,' Carey replied.

" 'I'd think more of your defense if you confessed they were paid for the work they did for the credit corporation by the Northwest Fruit Exchange and the American Fruit Growers,' the judge replied.

" 'It is disgusting to me that people come into court under oath and testify to things that are palpably untrue. It's an insult to the intelligence of the court to offer such answers.' "

On December 16th, there was an article published in all editions of the paper under the headline "OUR APOLOGIES TO S. H. CAREY." The following is a paragraph from the article:

"The Associated Press, in a dispatch received yesterday by THE POST-INTELLIGENCER, now reports that the criticism was not directed against Mr. Carey, personally, but against a set of answers supplied to him by a third person."

Appellants' assignments of error raise two major questions: (1) the sufficiency of the evidence to sustain the verdict and (2) the propriety of two instructions requested and refused and the correctness of three instructions given.

The article as published was a verbatim reproduction of

an associated press story emanating from Spokane. The facts upon which the story was based are not in dispute.

On November 4th, Carey was engaged in the trial of a case, as attorney for the defendant, in the Federal court at Spokane. Prior to trial, the plaintiff had made a request in writing of defendant for admissions. Defendant had responded to the request with answers in writing signed under oath by its regional manager. The request and the answers were being presented to the court and being made a part of the trial record after the manner of reading depositions in the superior court—one attorney reading the questions and opposing counsel reading the answers. Carey was sitting on the witness stand reading the defendant's answers to the request for admissions as they were propounded by opposing counsel. As the reading progressed, Judge Schwellenbach interrupted and the following colloquy occurred between him and Carey:

"THE COURT: Do you mean to say that these defendants are here contending that these people worked there, doing all the work for the Columbia Agricultural Credit Corporation, and that they didn't get paid for it by anybody? MR. CAREY: That is true. THE COURT: They were doing charity work for the community? MR. CAREY: It was in a sense a civic movement. THE COURT: I would think a great deal more of the defendant if Mr. Foster would frankly confess what we all know would be the fact, that the pay which these men received for their work in the Columbia Agricultural Credit Association came from the Northwestern Fruit Exchange and the American Fruit Growers. It does not help their case very much— MR. CAREY: (Interrupting) Now, Your Honor— THE COURT: I know all about these credit corporations. MR. CAREY: Now, I would like the opportunity of satisfying Your Honor on that.

"THE COURT: I do not think it is material. It is just disgusting to me to have people come into court and swear under oath to things that are so absolutely and so palpably untrue as these things you are giving, that these people did the work for nothing. Of course they were paid by the Northwestern Fruit Exchange, and paid by the American Fruit Growers. You have question after question answered in that way, when there is not anybody in the room who does not know but what the answers that they give are not

true. MR. CAREY: Just a moment, Your Honor. That criticism perhaps should be directed at me rather than at them. THE COURT: You cannot tell me that Mr. Foster accepted something that you made out for him, and signed it, without knowing what he signed. MR. CAREY: No, that is not true. I submitted these to him, but there has been so much confusion, as I thought, about bookkeeping matters, that I very particularly inquired how these salaries were charged and carried on the books of the several corporations, and that is the way the salaries were actually charged, and that is the reason that I made the answers in that form.

"THE COURT: Yes, but you go further and say that they got no salary and received no compensation from the Columbia Agricultural Credit Association. He did receive compensation from the American Fruit Growers and the Northwestern Fruit Exchange for services rendered to those corporations. MR. CAREY: Yes, and that is actually the way that it appears on the books. THE COURT: I think it is an insult to the intelligence of the Court to come in and answer questions in that way. . . . MR. CAREY: At the risk of incurring your Honor's ire, I will read the next. THE COURT: You have done your damage now. You have answered it. You have got to go through with it."

■■ In the light of this colloquy, appellants take the position that the associated press story was substantially true. Substantial truth is, of course, a complete defense to a charge of libel. *Quinn v. Review Pub. Co.*, 55 Wash. 69, 104 Pac. 181, 133 Am. St. 1016. But the issue of truth is a question of fact to be determined by the jury unless it can be said that reasonable minds could arrive at but one conclusion upon the evidence.

■ In determining whether or not an article is libelous, we must take it by its four corners and read it as a whole, and we must construe it in the sense it would ordinarily be understood by persons reading it. *Graham v. Star Pub. Co.*, 133 Wash. 387, 233 Pac. 625; *Miles v. Louis Wasmer, Inc.*, 172 Wash. 466, 20 P. (2d) 847; *Wells v. Times Printing Co.*, 77 Wash. 171, 137 Pac. 457. So read and so construed, the article plainly carries the imputation that Judge Schwellenbach censured Carey for falsely testifying. That that was the purport of the article was admitted by Russell

H. Peters, the managing editor of the Post-Intelligencer. He testified:

"Q. Now you say, in answer to counsel's question, that the story left the impression with you, or the idea, that the Judge had criticized an attorney for making a misstatement of fact. Did you recognize at the time that that story said that this witness was testifying under oath, and that the Judge said he was swearing to false testimony? A. That is true. Q. That is true? A. Yes. Q. And you realized, of course, that that was a gross libel, if it was not true, didn't you? A. That is perfectly true."

■ Imputing, as it did, the crime of perjury, the article was libelous *per se (Quinn v. Review Pub. Co., supra)*, for Carey was not testifying at all. To one understanding the background of the colloquy between Carey and Judge Schwellenbach, it is clear that the latter did not charge the former with giving false testimony. Carey's assumption of responsibility for framing the answers which his client made in response to the demand for admissions, does not alter the fact that he was not testifying nor the fact that he was not accused of giving false testimony by Judge Schwellenbach.

But, appellants argue, under his oath as an attorney and under the ethical standards promulgated by the American Bar Association, Carey was bound to frame the answers to the request for admissions with candor and without equivocation. Assuming the answers to have been equivocal, we fail to see any justification for the publication of an article carrying the imputation that Judge Schwellenbach, in effect, charged him with perjury.

■ Appellants contend that, being the report of a judicial proceeding, publication of the story is attended by the rule of qualified privilege, and that malice must be alleged and proved in order to sustain a cause of action. Truth of a story, libelous *per se,* is a complete defense. If the story be false, however, qualified privilege does not absolve the publisher even though the charges be made in good faith. *Byrne v. Funk,* 38 Wash. 506, 80 Pac. 722; *Quinn v. Review Pub. Co., supra; Graham v. Star Pub. Co.,*

*supra; Hollenbeck v. Post-Intelligencer Co.,* 162 Wash. 14, 297 Pac. 793. In the case last cited, the court said, p. 19: ". . . the privilege ends when falsity begins, and if . . . the charge is false the privilege, if there was one, was therefore exceeded."

The article was libelous *per se.* If false, its publication did not fall within the rule of qualified privilege. In such case, it is not necessary to prove malice. *Miles v. Louis Wasmer, Inc., supra.*

█ The appellants requested an instruction as follows:

"When a newspaper merely reprints a dispatch sent from a distant city by a reputable news service, that newspaper is not held to the same responsibility for the truth of the report published as in instances when a newspaper's own reporters gather the news and write the story."

The court rejected the request and, instead, instructed the jury that the fact the article was a news item received from the associated press "does not constitute either excuse or justification." Appellants' request finds support in the case of *Layne v. Tribune Co.,* 108 Fla. 177, 146 So. 234, 86 A. L. R. 466. That decision, however, appears to be against the weight of authority. The prevailing rule in this country was epitomized by Mr. Justice Holmes in *Peck v. Tribune Co.,* 214 U. S. 185, 189, 53 L. Ed. 960, 29 S. Ct. 554, 16 Ann. Cas. 1075: "If the publication was libelous the defendant took the risk. As was said of such matters by Lord Mansfield, 'Whatever a man publishes, he publishes at his peril.' " *Schuyler. v. Busbey,* 68 Hun. 474, 23 N. Y. Supp. 102 (affirmed 142 N. Y. 680, 37 N. E. 825); *Sanders v. Times-Picayune Pub. Co.,* 168 La. 1125, 123 So. 804; *A. H. Belo & Co. v. Smith,* 40 S. W. 856 (affirmed 91 Tex. 221, 42 S. W. 850). In 39 Am. Jur. 20, § 32, the rule is stated as follows:

"It is ordinarily held that the publication of defamatory matter by a newspaper is not privileged by reason of the fact that it is copied from another publication, or comes through the regular channels of news collection, without any notice of its falsity, and that the newspaper publishing

it is liable in damages to the person libeled, in the absence of other justification."

The principle stated was applied in *Miles v. Louis Wasmer, Inc., supra.* Remoteness of the source of a defamatory article does not serve to diminish its harmful effect nor to mitigate the damage caused by it.

■ Appellants assign error upon the refusal of the court to give a requested instruction reading as follows:

"Although the defendants have the burden of proving that the story of which the plaintiff complains is true, the law does not require that the defendants prove the story was meticulously and exactly true in all respects. It is sufficient if the defendants show that the story was a substantially true and accurate recital of what occurred in the court room. If you believe that the story of which the plaintiff complains was a substantially true and reasonably accurate report of what was said in the court room, your verdict must be for the defendants."

We think the substance of the request was adequately covered in an instruction on qualified privilege and malice in which the court stated: "Any person and any newspaper has a qualified privilege when reporting what occurred at a judicial proceeding. Such a report is qualifiedly privileged, and damages cannot be recovered for inaccuracies in the report unless the privileged occasion was abused." The court did not err in refusing to give the requested instruction.

■ Appellants assign error upon an instruction given to the effect that respondent was under no duty to demand of appellants a correction or retraction of the story. The instruction was proper. *Coffman v. Spokane Chronicle Pub. Co.,* 65 Wash. 1, 117 Pac. 596, Ann. Cas. 1913B, 636.

■ The appellants requested the court to give an instruction reading as follows:

"When considering whether the plaintiff was defamed by the use of the word 'testifying' in the article of which he complains, you may consider the fact that he was and is a sworn officer of the court, obligated under his oath as a member of the Bar of the state of Washington to employ such means only as are consistent with truth, never to

seek to mislead the judge by any artifice or false statement of facts or law and obligated under his oath as an officer of the United States District Court to demean himself as an attorney, counsellor and solicitor of that court uprightly."

We think the request was properly refused. The fact that his oath as an attorney obligated him to maintain certain ethical standards toward the court affords no justification nor excuse for the imputation of perjury inherent in the article published.

■ Appellants assign error "In instructing the jury that the article was a malicious libel." The instruction was in accord with the rules laid down in the decisions we have cited in our discussion of malice and qualified privilege. The assignment of error is without merit.

Judgment affirmed.

SIMPSON, C. J., MILLARD, ROBINSON, and MALLERY, JJ., concur.

[1] Reported in 143 P. (2d) 862.