[No. 22104-3-I. Division One. March 20, 1989.]

HARLEY H. HOPPE, ET AL, *Appellants,* v. THE HEARST CORPORATION, ET AL, *Respondents.*

*Richard B. Sanders* (*John C. Trotter, Keith Frabrizi,* and *Trotter, Trotter & Frabrizi,* of counsel), for appellants.

*Camden Hall, David Utevsky, Madeleine Brenner,* and *Foster, Pepper & Shefelman,* for respondents.

WINSOR, J.—Harley and Teresa Hoppe (Hoppe) appeal from an order of summary judgment dismissing defamation and other tort claims made in response to a column that appeared in the Seattle Post–Intelligencer (P–I). We affirm.

In the spring of 1983, Harley Hoppe, then King County Assessor, was embroiled in controversy over having hired private detectives to trail a deputy assessor who had publicly charged Hoppe's office with wrongful assessment practices. At the time, it was revealed that Hoppe had secretly monitored county employees on other occasions. Local newspapers published prominent articles about the private detective incident and, although the State Attorney General's Office upheld the legality of the practice, sharply criticized Hoppe in editorials and political cartoons. Later that year, Hoppe lost his post in a hotly contested election.

In the midst of the controversy surrounding Hoppe, the P–I published a column by Emmett Watson, a Seattle columnist known for his sharp pen and humorous, fanciful columns. Written in the form of a first–person narrative by "Philip Marlowe," the column parodied Raymond Chandler's detective novels. In Watson's column, Chandler's fictional private detective, Marlowe, was visited by an unsavory character who offered Marlowe $1,000 to follow county employees for "da boss," the county assessor, "Hurley Herpes".[1] In the most pertinent part of the column, Marlowe wondered where the money to hire private investigators came from:

---

[1] The complete text of the article is reproduced in the appendix.

"Don't tell me where he gets the money," I said. "I bet he hits the quinella every day." . . . "Or maybe he just kind of ups a property assessment here and there and some of the money drips over into the Private Eye Benevolent Fund."

Watson, *One Job That Hurley Herpes Mis–Assessed,* Seattle Post–Intelligencer, May 22, 1983, at A11, col. 5.

Hoppe brought an action against Watson and the Hearst Corporation (Hearst),[2] stating claims of defamation, invasion of privacy, outrage, and intentional or negligent infliction of emotional distress. He subsequently moved for partial summary judgment as to liability. Watson and Hearst cross–moved for dismissal of all Hoppe's claims. The trial court denied Hoppe's motion, granted defendants' cross motion, and entered an order dismissing Hoppe's complaint. Hoppe sought direct review in the Washington Supreme Court. That court declined review and transferred the matter to this court for determination.

### DEFAMATION CLAIM

We first address whether the trial court erred in dismissing Hoppe's defamation claim. The threshold requirement in a defamation action is that the defendant must have made a defamatory communication. Unless this requirement is satisfied, there is no actionable defamation claim.

Ordinarily, a defamatory communication involves a false statement of fact. However, an expression of opinion can be defamatory if it implies that defamatory facts are the basis of the opinion. *Dunlap v. Wayne,* 105 Wn.2d 529, 538, 716 P.2d 842 (1986); *Camer v. Seattle Post–Intelligencer,* 45 Wn. App. 29, 39, 723 P.2d 1195 (1986), *review denied,* 107 Wn.2d 1020, *cert. denied,* 482 U.S. 916, 96 L. Ed. 2d 677, 107 S. Ct. 3189 (1987); *Benjamin v. Cowles Pub'g Co.,* 37 Wn. App. 916, 921–22, 684 P.2d 739, *review denied,* 102 Wn.2d 1018 (1984); Restatement (Second) of Torts § 566, at 170 (1977). Humorous and satirical statements that imply defamatory facts can also be actionable. *See*

---

[2] Hearst publishes the P–I.

*National Rifle Ass'n v. Dayton Newspapers, Inc.,* 555 F. Supp. 1299 (S.D. Ohio 1983); *Lane v. Arkansas Vly. Pub'g Co.,* 675 P.2d 747 (Colo. Ct. App. 1983), *cert. denied,* 467 U.S. 1252, 82 L. Ed. 2d 840, 104 S. Ct. 3534 (1984). A humorous or satirical writing will not result in defamation liability when

> all that the communication does is to express a harsh judgment upon known or assumed facts . . . For maintaining the [defamation] action it is required that the expression of ridicule imply the assertion of a factual charge that would be defamatory if made expressly.
>
> In addition, the communication may be understood only as good–natured fun, not intended to be taken seriously and in no way intended to reflect upon the individual. Thus a narration by a toastmaster at a banquet of some entirely fictitious and ridiculous incident involving the speaker whom he is introducing is not reasonably to be understood as defamation but only as a jest. But if the same narrative is reported in a newspaper in such a way as to fail to make clear to its readers the circumstances under which it was related, it may become defamatory.

Restatement (Second) of Torts § 566, comment *d,* at 176 (1977).

■■ Whether an expression of opinion or a satirical column is capable of bearing a defamatory meaning by implying the assertion of undisclosed facts is a question of law for the court. Restatement, *supra* § 614, § 566, comment *c,* at 173; *accord, Swartz v. World Pub'g Co.,* 57 Wn.2d 213, 215, 356 P.2d 97 (1960) (holding generally that it is for the court to decide whether a communication is capable of a defamatory meaning). In making this determination, the court should consider whether the allegedly defamatory expression, in context, could reasonably be understood as describing actual facts about the plaintiff. *Pring v. Penthouse Int'l, Ltd.,* 695 F.2d 438, 442 (10th Cir. 1982), *cert. denied,* 462 U.S. 1132, 77 L. Ed. 2d 1367, 103 S. Ct. 3112 (1983); *Lane v. Arkansas Vly. Pub'g Co., supra.*

Other factors for the court to consider include: (1) the meaning of the entire article, not merely a particular phrase

or sentence; (2) the nature of the medium in which the statement was published, *i.e.*, whether it is one in which statements of fact or statements of opinion are more likely to be found; and (3) the nature of the audience to whom publication was made, *i.e.*, whether the statement appeared in the context of an ongoing public debate in which the audience is prepared for mischaracterizations and exaggerations. *Dunlap*, 105 Wn.2d at 539–40; *Camer*, 45 Wn. App. at 39–41. Additional considerations, identified in *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984), *cert. denied*, 471 U.S. 1127, 86 L. Ed. 2d 278, 105 S. Ct. 2662 (1985), are "whether the statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous[;]" and whether the statement is "capable of being objectively characterized as true or false[.]" Thus, "[i]nsofar as a statement lacks a plausible method of verification, [courts can conclude that] a reasonable reader will not believe that the statement has specific factual content." *Ollman*, 750 F.2d at 979; *see also Benjamin*, 37 Wn. App. at 923.

Hoppe first contends that the Watson article is defamatory in that by use of the name "Hurley Herpes", it implies that Hoppe has herpes. The trial court considered and properly rejected this contention. The identification of Hoppe as "Hurley Herpes" cannot be reasonably understood as describing an actual fact concerning Hoppe's medical condition; nor can it be objectively characterized as true or false. *Pring v. Penthouse Int'l, Ltd., supra; Ollman v. Evans, supra; Benjamin v. Cowles Pub'g Co., supra.* Moreover, the audience to whom the column was directed, *i.e.*, Watson readers, knew Watson frequently used alliterative nicknames to refer to public figures.[3]

---

[3]Nicknames used by Watson include Governor Spellbound (Spellman); E. Watkins Worrywart (Watson himself); President Popular (President Reagan); J. Dormant Brahman (former Seattle Mayor Brahman); and Smilin' Jack (former coach Jack Patera).

Hoppe also asserts that the column implied the defamatory fact that he misappropriated public funds, wrongfully increased property assessments, or was guilty of some other form of official misconduct. He argues that under *Vern Sims Ford, Inc. v. Hagel,* 42 Wn. App. 675, 713 P.2d 736, *review denied,* 105 Wn.2d 1016 (1986), the column was therefore actionable. In *Vern Sims Ford,* the court stated that "[a]ccusations of criminal activity, even in the form of opinion, are not constitutionally protected. . . . No First Amendment protection enfolds false charges of criminal behavior." (Italics omitted.) 42 Wn. App. at 683–84 (quoting *Cianci v. New Times Pub'g Co.,* 639 F.2d 54, 63 (2d Cir. 1980)).

■ Hoppe's reliance on *Vern Sims Ford* is misplaced, as that case does not concern allegedly defamatory statements made in the form of satire, parody, or humor. In this context, a somewhat different analysis is used. As the *Lane v. Arkansas Vly. Pub'g Co., supra,* court explained:

> An article in the form of an opinion which could imply the commission of illegal activity is actionable if the context in which it appears suggests it was meant literally. But, it is not actionable if it would be understood as rhetorical hyperbole meant to express an opinion on the plaintiff's performance of his job.

(Citations omitted.) 675 P.2d at 751. The *Lane* court applied this analysis to a defamation claim arising from a series of satirical columns and articles concerning a county commissioner embroiled in a recall campaign. The court held that in the context of a heated recall campaign, "the comments of a fictional character with an unlikely background cannot be taken as serious allegations of illegal use of county funds or other illegal activity". *Lane,* 675 P.2d at 752. *See also Cianci,* 639 F.2d at 64 (an author's opinion is not actionable unless it conveys a charge that could reasonably be understood as imputing specific criminal or other wrongful acts).

Here, Watson published his column during a political campaign, and in the context of a well publicized debate

over Hoppe's use of public funds to hire detectives. In the context of an ongoing political controversy, "the audience is prepared for mischaracterizations and exaggerations, and is likely to view such representations with an awareness of the subjective biases of the speaker.'" *Dunlap,* 105 Wn.2d at 539 (quoting Note, *Fact and Opinion After Gertz v. Robert Welch, Inc.: The Evolution of a Privilege,* 34 Rutgers L. Rev. 81, 122 (1981)). Moreover, the column was published in a unique format readily distinguished from more general news articles.[4] Its humorous tone and first–person narrative style further indicated that the column did not concern actual events.

Considering the context of the column and its tone, we conclude as a matter of law that Watson's column did not imply the allegation of defamatory facts, or allege criminal conduct. Because the Watson column was not defamatory, the trial court correctly dismissed Hoppe's defamation claim.

OTHER CLAIMS

In addition to his defamation claim, Hoppe also made outrage, intentional or negligent infliction of emotional distress, and false light invasion of privacy claims. The trial court dismissed each of these claims, reasoning that in cases involving a public official, none of these claims could be maintained without a showing that the defendant acted with actual malice. The court reasoned that "if a mere negligence standard were applied . . . then the protection under the First Amendment would be substantially eroded and somewhat chilled." The trial court correctly decided this issue, and we affirm its dismissal of Hoppe's tort claims.

In *Hustler Magazine v. Falwell,* ___ U.S. ___, 99 L. Ed. 2d 41, 108 S. Ct. 876 (1988), which concerned a particularly vicious parody of the Reverend Jerry Falwell, the Supreme Court held that a public figure plaintiff could not

---

[4]Watson's picture and by–line accompanied the column, which was set off from the rest of the page by a black outline.

recover damages for the intentional infliction of emotional distress without showing that the publication at issue contains a false statement of fact made with reckless disregard to the truth, *i.e.*, actual malice. The *Falwell* Court made clear that at least for purposes of finding malice to sustain the tort of intentional infliction of emotional distress, and perhaps for other torts as well, evidence of a speaker or publisher's bad motive is not controlling:

> Thus while such a bad motive may be deemed controlling for purposes of tort liability in other areas of the law, we think the First Amendment prohibits such a result in the area of public debate about public figures.

*Falwell,* 99 L. Ed. 2d at 50. In reaching its holding, the *Falwell* Court relied heavily on defamation law, and applied the actual malice standard of *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964).

The standard for finding actual malice is subjective, and focuses on the declarant's belief in, or attitude toward, the truth of the communication at issue. To prove actual malice, a plaintiff usually must establish that the declarant knew the expression was false, acted with a high degree of awareness of its probable falsity, or in fact entertained serious doubts as to the statement's truth. *Margoles v. Hubbart,* 111 Wn.2d 195, 200, 760 P.2d 324 (1988); *Story v. Shelter Bay Co.,* 52 Wn. App. 334, 343, 760 P.2d 368 (1988).

When, however, the allegedly defamatory expression at issue is satire, humor, or fiction, this standard cannot be used since in any such work, it is likely the author did not intend the work to be completely truthful. *See Miss America Pageant, Inc. v. Penthouse Int'l, Ltd.,* 524 F. Supp. 1280, 1283–85 (D.N.J. 1981). Thus, a different standard has been developed for determining malice in these situations, namely: whether the author intended, or recklessly failed to anticipate, that readers would construe the publication as a statement of defamatory facts. *See Miss*

*America Pageant,* 524 F. Supp. at 1286–87; R. Smolla, *Defamation* § 4.09[7][c] (1988).

We have already determined that Watson's column does not imply defamatory facts. There is absolutely no evidence in the record that Watson or Hearst intended the column to convey defamatory facts, or believed that the column did convey such facts. We therefore hold that Hoppe failed to establish a prima facie case of malice and, pursuant to *Falwell,* affirm dismissal of Hoppe's intentional infliction of emotional distress claim.

This lack of malice also compels us to affirm the trial court's dismissal of Hoppe's negligent infliction of emotional distress, and false light invasion of privacy claims.[5] Although *Falwell* specifically addressed only intentional infliction of emotional distress, it would be nonsensical to allow circumvention of the First Amendment considerations in *Falwell* by permitting public figures to recover for these torts without proof of actual malice. The reasoning of the *Falwell* Court supports this conclusion:

> The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office . . . Such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to "vehement, caustic, and sometimes unpleasantly sharp attacks," . . .
>
> Of course, this does not mean that any speech about a public figure is immune from sanction in the form of damages. Since New York Times Co. v. Sullivan, supra, we have consistently ruled that a public figure may hold a speaker liable for the damage to reputation caused by publication of a defamatory falsehood, but only if the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." . . . But even though falsehoods have little value in and of themselves, they are "nevertheless inevitable in free

---

[5]We note that the trial court could have properly dismissed Hoppe's false light claim on the basis that thus far, Washington has not recognized the tort. *See Eastwood v. Cascade Broadcasting Co.,* 106 Wn.2d 466, 473–74, 722 P.2d 1295 (1986).

debate," and a rule that would impose strict liability on a publisher for false factual assertions would have an undoubted "chilling" effect on speech relating to public figures that does have constitutional value. "Freedoms of expression require "'breathing space.'"

(Citations and italics omitted.) *Falwell*, 99 L. Ed. 2d at 49–50. Other courts have reached the same result. *See Fitzgerald v. Penthouse Int'l, Ltd.*, 525 F. Supp. 585, 602–03 (D. Md. 1981) (in false light claim, limited purpose public figure must show actual malice), *rev'd in part on other grounds*, 691 F.2d 666 (4th Cir. 1982), *cert. denied*, 460 U.S. 1024, 75 L. Ed. 2d 497, 103 S. Ct. 1277 (1983); *Colbert v. World Pub'g Co.*, 747 P.2d 286, 289–91 (Okla. 1987) (there is no recovery from a media defendant for the false light invasion of privacy absent a showing of malice).

■ Finally, we hold that the trial court properly found Hoppe did not make an evidentiary showing sufficient to maintain his outrage claim. The tort of outrage requires a showing of (1) intentional or reckless infliction of emotional distress,[6] (2) by outrageous and extreme conduct of the defendant, (3) resulting in severe emotional distress to plaintiff. *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291, 77 A.L.R.3d 436 (1975). The act at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" (Italics omitted.) *Grimsby*, 85 Wn.2d at 59 (quoting Restatement (Second) of Torts § 46, comment *d*, at 73 (1965)). The Watson column, as a matter of law, did not approach this level of conduct.

We affirm the order of summary judgment.

---

[6]Under *Falwell,* it would seem that in an action brought by a public figure this element also includes a requirement that the defendants have acted with actual malice. It is unnecessary to conclusively decide this issue, however, given the dearth of evidence supporting other elements of the tort.