# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

LARRY SEAQUIST and CARLA SEAQUIST, and the marital community comprised thereof,

Appellants,

v.

MICHELLE CALDIER, a single person,

Respondent.

No. 50816-8-II

PUBLISHED OPINION

WORSWICK, J. — In 2014, Larry Seaquist and Michelle Caldier were competing for 26th District State Representative. Larry and Carla Seaquist allege that Caldier defamed Seaquist and placed him in a false light through political campaign materials and in an interview. Caldier moved for summary judgment dismissing the Seaquists' claims. The Seaquists appeal the trial court's order granting Caldier's motion for summary judgment dismissal of both claims.

Although some of Caldier's statements were unquestionably misleading and ignoble, the Seaquists have not established a prima facie case of defamation or false light by evidence of convincing clarity. Therefore, we affirm.

## FACTS

### I. FACTUAL HISTORY

In 2014, Caldier challenged Seaquist for his 26th District State Representative position. On August 29, 2014, after attending a political candidate endorsement interview at the *Kitsap Sun* office in Bremerton, both candidates exited the building and went to their respective vehicles. Seaquist's vehicle was parked directly behind Caldier's along the street. While both

candidates were sitting in their cars, but before either drove off, Seaquist took two identical photos of the back of Caldier's car. Seaquist later stated that he was impressed with the mechanics of the car's convertible roof and that he took the photograph to assist him in remembering the car's make and model.

The photos show the back of a white Lexus IS250 C convertible with the top down. The photos are a wide angle shot, with the street on the left, sidewalk and parking lot on the right, and the bottom of the frame shows the dashboard of the vehicle from which the photos were taken. On close inspection, a portion of Caldier's face can be seen through the rearview mirror of the Lexus. Caldier's red sunglasses cover most of the portion of her face that can be seen in the mirror.

Caldier noticed what Seaquist was doing, exited her car, and asked Seaquist if he had taken photos. Seaquist responded in the affirmative.

Four days later, on September 2, Caldier posted on Facebook saying, "I came out of a candidate interview and saw Rep. Larry Seaquest [sic], my opponent, taking pictures of me as I got into my car. Wow. . . . I felt like I was being stalked!" Clerk's Papers (CP) at 708. Individuals commented on Caldier's post saying things like, "That's kinda creepy," "Wow, gross," "You might just be his midnight fantasy," and "I am happy to be your bodyguard." CP at 708-09. Caldier "liked" a number of the comments referring to Seaquist as weird, creepy, and gross. CP at 508-12. Eventually Caldier removed the post.

On September 5, Caldier filed a police report with the Bremerton Police Department. She spoke with Officer Robert Davis Jr. who filled out the demographic and narrative pages of a police report. Caldier said that "on a couple of occasions" Seaquist took her photograph getting

2

out of a car or in public.  CP at 84.  Officer Davis wrote, "I advised Caldier that from what she has told me Seaquist has not committed any crime."  CP at 84.  The report also notes that Caldier stated people had taken photos of her home and children and trespassed on her property.  Caldier further stated that she did not want Seaquist contacted.

A week later, on September 12, Steven Gardner of the *Kitsap Sun* wrote an article discussing Caldier's Facebook post and police report, and garnered comments from both candidates about the incident.  The article included Seaquist's photo of Caldier and her car, which Caldier acknowledges she saw when she read the article.

On October 8, the Caldier campaign released a video ad on YouTube and local television mentioning the incident.  A portion of the video included an actor saying, "Seaquist was caught secretly photographing Michelle, invading her privacy."  Ex. B.  When the actor said this, the screen showed a doctored photograph making Seaquist appear to be hunched over taking a photo with text underneath stating, "Larry Seaquist was caught secretly taking photos of Caldier."  CP at 712 (capitalization omitted).  The video also showed text saying, "Source: Police report filed September 5, 2014."  Ex. 1 at Ex. B (capitalization omitted).  Caldier approved the video.

On October 10, Caldier was interviewed on a radio show.  The following exchange occurred:

> [Host]:  Well, let me ask both of you, then—Melanie and Michelle [Caldier]—you're Republicans, right?  And we're told that Republicans have a war on women.  Why in the world did you choose the Republican Party?  Why don't you each step in and let me know?  Michelle, why don't you go first?
>
> [Caldier]:  Well, it's funny because I did not even know that there was a war on women.  In fact, I have had so much support from the party, and, you know, with some of the experiences I've gone through.  I've been actually harassed and had people take pictures of me, had my opponent take pictures of me.  I'd have to say that the Democrats probably have more of a war of women, with my experience.

CP at 88-89.

Sometime near October 16, Caldier sent out a campaign mailer to voters in Kitsap and Pierce counties. One side of the mailer contained the same doctored image of Seaquist as seen in the campaign video. Seaquist was made to appear hunched over, with his coat collar up, sneakily taking a photo with a camera phone while in a grassy area. In print, the mailer read, "WHY WAS LARRY SEAQUIST TAKING PICTURES of Michelle Caldier?"[1] CP at 93. Underneath this, the mailer stated, "CALDIER FILES POLICE REPORT." CP at 93.

On the other side of the mailer, a number of statements were under the heading, "CALDIER FILES POLICE REPORT AGAINST SEAQUIST." CP at 94. On the left side were two separate statements, "Why Were Seaquist Campaign People Taking Pictures at Caldier Home?" and, directly beneath, "Caldier Files Police Report Against Seaquist." CP at 94. The middle of the mailer had the heading, "Multiple Incidents Lead to Concern by Caldier." CP at 94.

Under this, there was text on the left and an image of a demographic page of the police report Caldier filed against Seaquist. The text stated:

> It started with unwelcome strangers taking pictures of her home. Then the mailbox was tampered with leading to the likelihood of trespassing—a Federal offense. The final straw was an inappropriate intrusion by Larry Seaquist himself, sneakily taking pictures of Michelle while she was getting in to her car.

---

[1] At some time during 2014, Caldier's neighbor alerted her that some of her mail was on the ground instead of inside the mailbox as if a person had gone through it. Caldier also noticed someone who said he was a real estate appraiser taking photographs of her recently purchased house. Caldier's sister, who served as her campaign manager, also noticed someone taking photos of her own house.

> Enough is enough! Michelle filed a police report seen here to communicate a message to Larry Seaquist and his campaign staff that they had crossed the line. Friendly campaigning had turned into what felt like stalking and harassment to Ms. Caldier, so she took action.

CP at 94.

Under this block of text, there was a photo. The photo showed the hands of a person taking a photo of Caldier in her car. The photographer was at the passenger side window taking the photo of Caldier's profile. Next to this photo and under the police report image was a photo of Seaquist. Under Seaquist's photo and in large lettering, the mailer stated, "Larry Seaquist Should be Ashamed." Under this, "You would expect a higher level of integrity from a man with Larry Seaquist's experience. Has the Seaquist team resorted to dirty tactics to win? It appears so." CP at 94. Finally, on the right side of the mailer, there was a picture of Caldier with the accompanying text, "'I don't think a female candidate is supposed to feel like I have felt in the privacy of my own home and car. This kind of behavior is concerning and possibly illegal.'—Michelle Caldier." CP at 94.

A website promoting Caldier's campaign, Larryseaquistfacts.com, posted the same graphics and statements as the mailer, except for Caldier's picture and quote. The website contained additional information recounting and criticizing Seaquist's political stances. Caldier acknowledged that this website promoted her campaign, but she denied running it or directing the content of the site. Caldier's campaign staff, however, acknowledged running the website as part of the Caldier campaign.

## II. PROCEDURAL HISTORY

After the Seaquists filed suit alleging defamation and false light. The lawsuit was dismissed, but later reinstated.[2]

After the superior court vacated its prior dismissal and findings, Caldier moved for summary judgment, which the superior court granted in part and denied in part. In its order, the court examined each statement and denied summary judgment regarding the statements it found to potentially support a defamation by implication claim. Because the court noted a split of authorities as to whether defamation by implication was a viable theory in this State, it certified the question to this court. However, the Seaquists renounced any defamation by implication claim and, as a result, we denied discretionary review.[3]

The trial court, after requiring the Seaquists to expressly state they waived any defamation by implication claims, granted Caldier's motion for summary judgment dismissing the case. The Seaquists appeal.

## ANALYSIS

### I. DEFAMATION AND FALSE LIGHT: LEGAL PRINCIPLES

Washington has adopted *Restatement (Second) of Torts § 652E*, recognizing invasion of privacy by false light as an independent claim. *Eastwood v. Cascade Broad. Co.*, 106 Wn.2d

---

[2] Caldier made a special motion to strike the complaint under the Washington act limiting "Strategic Lawsuits Against Public Participation" (anti-SLAPP statute), RCW 4.24.525. Following the trial court's dismissal of the Seaquists' claim under that statute and during the pendency of an appeal, our Supreme Court found the anti-SLAPP statute unconstitutional. *See Davis v. Cox*, 183 Wn.2d 269, 351 P.3d 862 (2015). Accordingly, the Supreme Court dismissed the Seaquists' appeal, remanding the case to the superior court.

[3] At oral argument, the Seaquists reaffirmed that they were not claiming defamation by implication.

466, 471, 473-74, 722 P.2d 1295 (1986). Defamation and invasion of privacy by false light are similar, yet distinct, causes of action. *See Eastwood*, 106 Wn.2d at 470-471. Although both actions rest on the disclosure of false or misleading information, they require different elements and allow for recovery of different damages. *Duc Tan v. Le*, 177 Wn.2d 649, 662, 300 P.3d 356 (2013); *Eastwood*, 106 Wn.2d at 470-71.

A prima facie defamation claim requires a plaintiff to prove falsity, an unprivileged communication, fault, and damages. *Duc Tan*, 177 Wn.2d at 662. An invasion of privacy by false light arises when a defendant publishes statements that place a plaintiff in a false light if (1) the false light would be highly offensive and (2) the defendant knew of or recklessly disregarded the falsity of the publication and the subsequent false light it would place the plaintiff in. *Eastwood*, 106 Wn.2d at 470-71.

"The theoretical difference between the two torts is that a defamation action is primarily concerned with compensating the injured party for damage to reputation, while an invasion of privacy action is primarily concerned with compensating for injured feelings or mental suffering." *Eastwood*, 106 Wn.2d at 471. A plaintiff does not need to be defamed in order to bring a false light claim, but any defamation action potentially gives rise to a false light claim. *Eastwood*, 106 Wn.2d at 471.

When the plaintiff is a public figure, both torts require proof of actual malice. *Duc Tan*, 177 Wn.2d at 662; *Hoppe v. Hearst Corp.*, 53 Wn. App. 668, 675-76, 770 P.2d 203 (1989). Actual malice is a defendant's knowledge of the statement's falsity or reckless disregard of the truth or falsity of the statement. *Duc Tan*, 177 Wn.2d at 669; RESTATEMENT (SECOND) OF TORTS § 652E (1997).

We review an order of summary judgment de novo, performing the same inquiry as the trial court. *Mohr v. Grant*, 153 Wn.2d 812, 821, 108 P.3d 768 (2005). Summary judgment is proper and the moving party is entitled to judgment as a matter of law when the nonmoving party shows no issue of material fact. *Mohr*, 153 Wn.2d at 821; CR 56(c). In a defamation action, summary judgment serves as an early test of the plaintiff's evidence. *Mark v. Seattle Times*, 96 Wn.2d 473, 486-87, 635 P.2d 1081 (1981). To defeat a defendant's motion for summary judgment on a defamation claim, the plaintiff "must establish a prima facie case by evidence of convincing clarity." *Mark*, 96 Wn.2d at 487.

## II. DEFAMATION

The Seaquists argue that they have shown a prima facie claim of defamation by Caldier's Facebook post, campaign video, statement during a radio broadcast, and statements within a campaign mailer and similar website. We disagree.

A.    *Legal Principles*

As stated above, a prima facie defamation claim requires a plaintiff to prove falsity, an unprivileged communication, fault, and damages. *Duc Tan*, 177 Wn.2d at 662. In proving falsity for a defamation claim, a plaintiff must prove either a statement was false or a statement left a false impression by omitted facts. *Mohr*, 153 Wn.2d at 823. A provably false statement is one that, as either a statement of fact or opinion, falsely expresses or implies provable facts about the plaintiff. *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590-91, 943 P.2d 350 (1997). When determining whether an article is defamatory, a court considers it as a whole and construes it by its ordinary meaning to a person reading it. *See Mark*, 96 Wn.2d at 496; *Carey v. Hearst Publ'ns, Inc.*, 19 Wn.2d 655, 659, 143 P.2d 857 (1943).

8

The First Amendment protects an individual's right to express an opinion, or "fairly comment," on a matter of public interest. *Dunlap v. Wayne*, 105 Wn.2d 529, 537, 716 P.2d 842 (1986). Specifically, the First Amendment applies to the fullest extent during a political campaign. *Rickert v. Pub. Disclosure Comm'n*, 161 Wn.2d 843, 848, 168 P.3d 826 (2007).

An alleged defamatory statement must be a stated fact, not a stated opinion. *Dunlap*, 105 Wn.2d at 537. However, a stated opinion may be actionable if it implies defamatory facts. *Dunlap*, 105 Wn.2d at 538. The distinction between a fact and an opinion implying defamatory facts requires a court to consider the totality of the circumstances. *Dunlap*, 105 Wn.2d at 539. To determine whether an opinion implies undisclosed defamatory facts, courts consider "(1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts." *Dunlap*, 105 Wn.2d at 539. Statements are more likely to be opinion when in the context of a political debate. *Dunlap*, 105 Wn.2d at 539. Further, in the context of ongoing public debate, audiences are prepared for mischaracterizations, rhetoric, and exaggerations, and are "likely to view such representations with an awareness of the subjective biases of the speaker." *Dunlap*, 105 Wn.2d at 539.

In proving falsity, a plaintiff must show either a false statement or a statement that leaves a false impression. *Mohr*, 153 Wn.2d at 823. A provably false statement is one that, as either a statement of fact or opinion, falsely expresses or implies provable facts about the plaintiff. *Schmalenberg*, 87 Wn. App. at 590-91. A defendant is not required to prove the literal truth of every claimed defamatory statement. *Mohr*, 153 Wn.2d at 825. The gist of the story or the portion carrying the "sting" must be substantially true. *Mohr*, 153 Wn.2d at 825. When a defendant makes a mixture of true and false statements, "a false statement (or statements) affects

9

the 'sting' of a report only when 'significantly greater opprobrium' results from the report containing the falsehood than would result from the report without the falsehood." *Mohr*, 153 Wn.2d at 826.

B.      *Alleged Defamatory Statements by Caldier*

The Seaquists argue that Caldier's statements were false or based on false facts and, thus, sufficient to overcome an order granting summary judgment in Caldier's favor. Because Caldier's statements are either true, nonactionable opinions, or statements about others, we hold that the trial court did not err in granting Caldier's motion for summary judgment regarding the defamation claim.

Considering the *Dunlap* factors, the audiences here, whether online, over the radio, through television, or in receipt of campaign mailers, would fully expect political campaign materials to be saturated with mischaracterizations, rhetoric, and exaggeration. All the alleged defamation was through campaign communications or a campaign interview. The First Amendment plays an extremely important role in political speech during campaigns. *See Rickert*, 161 Wn.2d at 848. Political mudslinging is expected by audiences during contentious elections. The race between Caldier and Seaquist for the 26th District State Representative position was no exception. It is through a political campaign lens that we consider Caldier's statements.

1.      *Facebook Post*

Caldier's Facebook post stated, "I came out of a candidate interview and saw Rep. Larry Seaquest [sic], my opponent, taking pictures of me as I got into my car. Wow. . . . I felt like I was being stalked!" CP at 708.

10

Here, the Seaquists did not present evidence that this statement was substantially false. Seaquist admits to taking pictures of Caldier after she got into her car and before driving away. Although it appears that Caldier was seated in her car when the photo was taken, the gist of the statement is true. Caldier's accompanying opinion about feeling "stalked" cannot be defamatory because there are no provable facts to the contrary. Caldier *feeling* "stalked" is her opinion based on her perception of the incident. Accordingly, the Seaquists' defamation claim as to the Facebook post was properly dismissed by the trial court.

2.      *Campaign Video*

Caldier's campaign published an attack video capitalizing on Seaquist taking the photos. A portion of the video included an actor saying, "Seaquist was caught secretly photographing Michelle, invading her privacy." Ex. B. When she said this, on screen, there was a doctored graphic showing Seaquist hunched over taking a photo and text underneath stating, "Larry Seaquist was caught secretly taking photos of Caldier." Ex. B. The video also reads, "Source: Police report filed September 5, 2014." Ex. B.

Again, Seaquist did take pictures of Caldier without her permission. If Caldier had not noticed Seaquist taking the photos, seemingly no one else would have known. While Seaquist says he was not being secretive, it is not provably false to describe his actions as secretive. The phrase, "invading her privacy," is an opinion and is not provably false either. While the Seaquists point out that it is not illegal to take photos of someone on the street and that a person has no legal expectation of privacy when moving about in public, a person's feeling of privacy is not provably false. Caldier's opinions and feelings about her personal privacy cannot be the basis of a defamation claim.

11

Further, although the photoshopped image of Seaquist taking a photo is deceiving, the gist is true. Similarly, Caldier did indeed file a police report on September 5, 2014, alleging that Seaquist had taken pictures of her. Accordingly, the campaign attack video cannot be the basis of a defamation claim.

3. *Radio Show Statement*

On the radio show, Caldier stated, "I have had so much support from the [Republican] party, and, you know, with some of the experiences I've gone through. I've been actually harassed and had people take pictures of me, had my opponent take pictures of me. I'd have to say that the Democrats probably have more of a war on women, with my experience." CP at 89.

Here, the only statement Caldier makes referencing Seaquist is that he took pictures of her. This statement is true. Accordingly, Caldier's statements on the radio show cannot be the basis of a defamation claim.

4. *Campaign Mailer and Website*

Caldier's campaign mailer contained a number of statements attacking Seaquist. Many of these statements were repeated on the website, Larryseaquistfacts.com.

a. *True Statements*

The mailer contained three true statements: (1) "WHY WAS LARRY SEAQUIST TAKING PICTURES of Michelle Caldier?" (2) "CALDIER FILES POLICE REPORT," and (3) "CALDIER FILES POLICE REPORT AGAINST SEAQUIST." CP at 93-94. Seaquist did take pictures of Caldier, and Caldier did indeed file a police report after the incident. Although Seaquist disagrees with the content of the police report itself, Caldier's broad statement about

12

filing a report is factually correct. Caldier simply states true facts; Seaquist took pictures of Caldier and she filed a police report.

### b. *Opinions*

The mailer contained multiple opinions. The mailer stated, "Larry Seaquist should be ashamed. You would expect a higher level of integrity from a man with Larry Seaquist's experience. Has the Seaquist team resorted to dirty tactics to win? It appears so." CP at 94. It also read, "'I don't think a female candidate is supposed to feel like I have felt in the privacy of my own home and car. This kind of behavior is concerning and possibly illegal.'—Michelle Caldier." CP at 94. These statements are nonactionable opinions and do not imply undisclosed defamatory facts.

### c. *Statements About Others, Not Seaquist*

The mailer asked, "Why were Seaquist campaign people taking pictures at Caldier home?" CP at 94. Although posed as a question, this statement implies that Seaquist's "campaign people" took pictures of Caldier's home. The group of "campaign people" is so broad as to leave a person unsure of who Caldier is referring to. She does not attribute actions directly to Seaquist, his campaign staff, or anyone directly under Seaquist's direction. This question is not defamatory to Seaquist, it asks a question about other people, not him.

### d. *Mixed Statements*

The body of the mailer had the heading: "Multiple Incidents Lead to Concern by Caldier." CP at 94. This was followed by two paragraphs:

> It started with unwelcome strangers taking pictures of her home. Then the mailbox was tampered with leading to the likelihood of trespassing—a Federal offense. The final straw was an inappropriate intrusion by Larry Seaquist himself, sneakily taking pictures of Michelle while she was getting in to her car.

13

> Enough is enough! Michelle filed a police report seen here to communicate a message to Larry Seaquist and his campaign staff that they had crossed the line. Friendly campaigning had turned into what felt like stalking and harassment to Ms. Caldier, so she took action.

CP at 94.

This portion of the mailer described what gave Caldier concern. This concern is an expressed opinion. Caldier stated that strangers took pictures of her home and that her mailbox was tampered with. However, she did not directly attribute either of these to Seaquist. Caldier again states that Seaquist took her picture, which is true. Explaining why Caldier filed a police report and expressing a feeling of stalking and harassment are opinions. Although the placement of certain statements in proximity to others suggested connections and correlations between them, the mailer did not expressly note anything beyond true facts, opinions, or actions not attributed to Seaquist himself.

> e.     *Doctored Image and Photo*

The Seaquists take issue with two images on the mailer. The first was the same doctored image of Seaquist holding a phone that was included in the campaign video. As we discussed above, the gist of this image is true. The second photo was a person's hands taking a photo of Caldier in her car. The photographer was at the passenger side window taking the photo of Caldier's profile. The broad gist of what the photo is attempting to recreate is true. Although the position of the photographer may be misleading, Seaquist did take a photo of Caldier in her car.

> f.     *Campaign Mailer as a Whole*

We next view Caldier's campaign mailer as a whole to construe it by its ordinary meaning to a person reading it. *See Mark*, 96 Wn.2d at 496. Although the mailer is

14

unquestionably misleading and ignoble, we hold that it is not provably false. The statements are either true, directed at people other than Seaquist personally, or opinion. The statements may carry negative and false implications, but because the Seaquists contend falsity in the statements themselves and not defamation by implication, they may overcome summary judgment only by proving falsity by convincing clarity. *See Mohr*, 153 Wn.2d at 823.

> 5. *Larryseaquistfacts.com Website*

The Seaquists also assert, based on the previously discussed statements and photographs that Larryseaquistfacts.com is defamatory. For the reasons discussed above, even assuming the website is attributable to Caldier, the statements on the website are not defamatory. The statements are either true, opinion, or statements about others.

C. *The Seaquists Failed To Establish a Prima Facie Case*

Accordingly, the Seaquists have failed to prove the falsity requirement of defamation with convincing clarity because all of Caldier's statements were either true, opinion, or statements concerning actions not attributable to Seaquist. As a result, the trial court did not err in granting Caldier's motion for a final judgment dismissing the defamation claim.

## III. FALSE LIGHT

The Seaquists argue that a final judgment should not have been entered regarding their false light claim. We disagree.

A. *Legal Principles*

A false light claim arises when a person publishes statements that place another in a false light if (1) the false light would be highly offensive and (2) the publisher knew of or recklessly disregarded the falsity of the publication and the subsequent false light it would place the other

in. *Eastwood*, 106 Wn.2d at 470–471; RESTATEMENT (SECOND) OF TORTS § 652E (1977). A

plaintiff does not need to be defamed in order to bring a false light claim. *Eastwood*, 106 Wn.2d

at 471. However, the plaintiff must allege falsity.[4] *Emeson v. Dep't of Corr.*, 194 Wn. App.

617, 640, 376 P.3d 430 (2016). When a public figure plaintiff alleges false light, he must also

prove the defendant acted with actual malice. *Hoppe*, 53 Wn. App. at 675-76.

Unlike defamation, our case law does not explicitly require a plaintiff to show a prima

facie false light claim to overcome a defendant's motion for summary judgment. However, other

jurisdictions require such prima facie showings. *See S.B. v. Saint James Sch.*, 959 So.2d 72, 93

(Ala. 2006); *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 859 (D.C. App. 1999). Requiring a

prima facie showing of a false light claim weighs First Amendment considerations alongside the

personal interests intended to be protected by invasion of privacy torts. Our Supreme Court in

*Eastwood* held that false light is subject to the defamation statute of limitations period because of

the parallels between the two torts. *Eastwood*, 106 Wn.2d at 469. Similarly, we implement a

requirement that a plaintiff must present a prima facie case of false light to overcome a motion

for summary judgment.

B.      *Alleged False Light of Seaquist*

Here, for the same reasons the Seaquists were unable to show falsity for defamation, they

fail to show falsity for a false light claim. The Seaquists allege only that Caldier made false

statements. We emphasize again that the Seaquists do not allege that the implications of her

statements are false. Because no statement is provably false, the Seaquists do not present a

---

[4]  Because the Seaquists argue falsity only by false statements, we do not discuss whether falsity
by implication can support a false light claim. *See* RESTATEMENT (SECOND) OF TORTS § 652E
cmt. b; *Mohr*, 153 Wn.2d at 825.

prima facie case of false light. Accordingly, the trial court did not err when it granted summary judgment in favor of Caldier on the false light claim.

CONCLUSION

The Seaquists were required to establish a prima facie case for their defamation and false light claims. Because they failed to establish a prima facie case for either a defamation or a false light claim, we affirm the trial court's summary judgment dismissal of both claims.

Worswick, J.

We concur:

Maxa, C.J.

Melnick, J.