NEW TIMES, INC. d/b/a Dallas Observer; Dallas Observer, L.P.; Rose Farley, Julie Lyons, and Patrick Williams, Appellants.

v.

Bruce ISAACKS and Darlene A. Whitten, Appellees.

Nos. 02–01–023–CV, 02–01–216–CV.

Court of Appeals of Texas, Fort Worth.

Nov. 21, 2002.

---

George & Donaldson, L.L.P., James A. Hemphill, Austin, Law Office of Steven P. Suskin, Steven P. Suskin, Phoenix, AZ, for Appellants.

Griffin, Whitten, Jones & Reib, Michael J. Whitten, Denton, for Appellee.

PANEL B: CAYCE, C.J.; GARDNER and WALKER, JJ.

## OPINION ON REHEARING

ANNE GARDNER, Justice.

Appellants, New Times, Inc., d/b/a *Dallas Observer,* Dallas Observer, L.P., Rose Farley, Julie Lyons, and Patrick Williams have filed a motion for rehearing regarding our original decision. We withdraw our opinion and judgment issued May 2, 2002, and substitute the following in their place. We overrule the motion for rehearing.

### I. INTRODUCTION

In this interlocutory appeal, we must decide two issues: whether an article defended as parody or satire regarding a public official or figure is mere opinion or rhetorical hyperbole and is, therefore, pro-

tected First Amendment speech; and what is the proper application of the "actual malice" standard to asserted satire or parody in a defamation action by public officials. Appellees Bruce Isaacks, Criminal District Attorney for Denton County, and Judge Darlene A. Whitten, Judge of the Denton County Court at Law Number One, sued the *Dallas Observer* for defamation arising from an article published by that weekly publication, attributing to them the detention of a fictional first-grade student on possible delinquency charges of making a terroristic threat in a book report. Appellants New Times, Inc., d/b/a *Dallas Observer*, Dallas Observer, L.P., Rose Farley, Julie Lyons, and Patrick Williams (collectively *"Dallas Observer"*) complain of the trial court's denial of their traditional and no-evidence motions for summary judgment, contending that the article was published as a satire and without actual malice as required for recovery of defamation by a public official.[1] We hold that a genuine issue of material fact exists as to whether a reasonable person could construe the asserted parody or satire as a statement of actual fact. We further hold that the test for actual malice adopted by the Supreme Court in *New York Times, Co. v. Sullivan*[2] applies to claimed satire or parody, and that the *Dallas Observer* has failed to establish lack of actual malice as a matter of law. We affirm the trial court's order denying the *Dallas Observer's* motions for summary judgment.

## II. FACTUAL BACKGROUND

On October 28, 1999, thirteen-year-old Christopher Beamon, a seventh-grader in Ponder, Texas, was ordered detained by Judge Whitten, who was then judge of the Denton County's juvenile court, after he wrote a graphic Halloween horror story depicting the shooting death of a teacher and two fellow students. He was released after being held for five days at the juvenile facility while the Denton County District Attorney's office considered delinquency charges. The case received considerable publicity, not only in the North Texas area, but also nationally.[3]

As described on its website, the *Dallas Observer* is an alternative newsweekly, "known for its hard-edged investigative stories about government, politics and business, as well as its pointed, provocative coverage of sports, music and the arts." *Publication Profiles,* DALLAS OBSERVER, <*http://www.newtimes.com/profiles_dal.html*> (last visited Nov. 20, 2002). On November 11, 1999, the *Dallas Observer* published an article in both its hard copy and on-line edition of its weekly newspaper in the section labeled "News," reporting that "[i]n the second homework-related arrest in as many weeks, a Denton County juvenile court judge [Whitten] jailed a Ponder student for suspicion of making a terroristic threat...."

The November 11th article, authored by staff-writer Rose Farley, was entitled

---

1. TEX. CIV. PRAC. & REM.CODE § 51.014(6) (Vernon Supp.2003) (allowing interlocutory appeal from order denying motion for summary judgment based upon claim or defense arising under the First Amendment of the United States Constitution or article 1, section 8 of the Texas Constitution).

2. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

3. The Beamon incident occurred approximately six months after high school students Eric Harris and Dylan Klebold killed twelve students and a teacher before taking their own lives on April 20, 1999 at Columbine High School in Colorado. *Tragedy in Colorado,* USA TODAY, <*http://www.usatoday.com/news/index/colo/colo156.htm*> (last visited Nov. 20, 2002).

"Stop the Madness." The article reported that Cindy Bradley, "a diminutive 6–year old," was arrested during "story-time" in her class at Ponder Elementary School for a book report she had written about an award-winning children's classic, *Where the Wild Things Are*, by Maurice Sendak. According to the article, Judge Whitten ordered Cindy detained for ten days at the Denton County Juvenile Detention Center while prosecutors decided whether to file charges.

The *Dallas Observer* article described Cindy as appearing subdued when she stood before Judge Whitten "dressed in blue jeans, a Pokemon T-shirt, handcuffs and ankle shackles." Judge Whitten was quoted as chastising Cindy from the bench:

> "Any implication of violence in a school situation, even if it was just contained in a first-grader's book report, is reason enough for panic and overreaction," Whitten said from the bench. "It's time for you to grow up, young lady, and it's time for us to stop treating kids like children."

The article further related that Denton County District Attorney Bruce Isaacks stated that he had not decided whether to prosecute Cindy. Isaacks was quoted as stating, "We've considered having her certified to stand trial as an adult, but even in Texas there are some limits." The article also reported sources as saying that courthouse security officers ordered shackles for Cindy after they reviewed her school record, which included "reprimands for spraying a boy with pineapple juice and sitting on her feet." A bailiff was also quoted as stating in the article, "It's not easy finding cuffs that small. Fortunately, we ordered a special set last week after that other kid was busted." The article then went on to explain the incident involving Christopher Beamon.

It is undisputed that, aside from references to Christopher Beamon's detention, the "Stop the Madness" article was completely made up. It was conceived and authored by Farley and ultimately published after input, editing, and approval by Williams, the managing editor for the paper, and Lyons, its editor in chief. Included with the article was a photograph of a six-year-old girl, identified as Cindy Bradley, who was actually the daughter of a *Dallas Observer* staff member.

After publication of the Madness article, complaints about Isaacks and Whitten were received and posted on the paper's website, accusing those officials of incompetency and calling for their dismissal from office based on their conduct as described in the article. Readers and other news media contacted Isaacks and Whitten directly, expressing anger and criticism of the described conduct in the article as being "sickening" and "stupid," insisting that Judge Whitten be removed from the bench, and urging that both should be "ashamed" of their conduct.

Isaacks and Whitten requested a retraction by the *Dallas Observer*. The *Dallas Observer* responded, explaining in its "Buzz" column of the next weekly edition that the Madness article was a satire, but describing readers who believed the report as "cerebrally challenged" and "clueless."

## III. PROCEDURAL BACKGROUND

Isaacks and Whitten filed suit for defamation, alleging that the article could be understood by the reasonable reader as making false statements of fact about them and that the statements were made with actual malice. They alleged that the article was libel *per se* because it accused them of conduct amounting to official oppression, false arrest, false imprisonment, civil rights violations, child abuse, and as-

sault. The *Dallas Observer* moved twice for summary judgment.

In its first motion for summary judgment, the *Dallas Observer* contended that, as a matter of law, the article was fictional satire or parody and that the *Dallas Observer* had not acted with the actual malice necessary for public official defamation. The *Dallas Observer* also sought a no-evidence summary judgment based on no evidence of actual malice. The trial court ruled that a genuine issue of material fact existed as to whether a reasonable reader would understand the article at issue was satire or parody. The court also denied the *Dallas Observer's* traditional motion for summary judgment based on lack of actual malice, ruling that Whitten and Isaacks were entitled to additional discovery on that element. For the same reason, the trial court also denied the *Dallas Observer's* no-evidence motion for summary judgment as to actual malice. The *Dallas Observer* later filed a second traditional and no-evidence motion for summary judgment confined to the actual malice issue, which the trial court also denied.

## IV. ISSUES ON APPEAL

In its first issue, the *Dallas Observer* generally complains that the trial court erred by denying both its traditional and no-evidence motions for summary judgment. In its second issue, the *Dallas Observer* contends that it was entitled to summary judgment because, as a matter of law, a reasonable reader would understand that the article, in context, was a satire or parody and did not purport to make statements of actual fact about Appellees. Thirdly, the *Dallas Observer* contends that it was entitled to a no-evidence summary judgment because Appellees could produce no evidence raising a genuine issue of material fact that the *Dallas Observer* acted with actual malice, an essential element in

a public official defamation case. Finally, the *Dallas Observer* argues that it was entitled to traditional summary judgment because it conclusively disproved actual malice.

## V. STANDARDS OF REVIEW

### A. Standards for Summary Judgment

■ The summary judgment standards of review in public official or public figure cases are the same as in other cases. *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 423 (Tex.2000) (declining to adopt the "clear and convincing" standard at the summary judgment stage of a public figure case). Whether an order grants or denies a motion for summary judgment, we apply the same *de novo* standard of review on appeal. *Gaylord Broad. Co. v. Francis*, 7 S.W.3d 279, 283 (Tex.App.-Dallas 1999, pet. denied).

### 1. Traditional Summary Judgment

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden of establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex.1999); *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex.1996); *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965). Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant. *Great Am.*, 391 S.W.2d at 47.

A defendant is entitled to summary judgment if the summary judgment evidence establishes, as a matter of law, that at least one element of a plaintiff's cause of action cannot be established. *Elliott–Williams Co. v. Diaz,* 9 S.W.3d 801, 803 (Tex.1999). Once the defendant-movant presents summary judgment evidence that negates an element of the plaintiff's claim, the burden shifts to the plaintiff to put on competent controverting evidence that proves the existence of a genuine issue of material fact with regard to the element challenged by the defendant. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995).

**2. No–Evidence Summary Judgment**

■ After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. TEX.R. CIV. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.; In re Mohawk Rubber Co.,* 982 S.W.2d 494, 497–98 (Tex.App.-Texarkana 1998, orig. proceeding). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. TEX.R. CIV. P. 166a(i) cmt.; *Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied); *Jackson v. Fiesta Mart, Inc.,* 979 S.W.2d 68, 71 (Tex.App.-Austin 1998, no pet.).

■ A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Frazier v. Yu,* 987 S.W.2d 607, 610 (Tex.App.-Fort Worth 1999, pet. denied); *Moore,* 981 S.W.2d at 269. We review the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences. *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex. 1994). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Moore,* 981 S.W.2d at 269.

## VI. POLITICAL SATIRE AND PARODY: ARE THEY PROTECTED BY THE FIRST AMENDMENT?

The *Dallas Observer* first contends that the trial court erred in failing to grant its motions for summary judgment because a reasonable reader would understand the "Stop the Madness" article as satire or parody, not as making statements of actual fact, and that, as such, the article is protected speech as a matter of law. The *Dallas Observer* does not contend that parody or satire is *per se* protected speech; rather, it contends that the article is protected because it amounts to opinion or rhetorical hyperbole rather than statements of fact. Whether an article is parody or satire regarding a public official or public figure and, therefore, is protected First Amendment speech, is a question of first impression for Texas courts.[4]

---

4. Two Texas courts have addressed the issue of sarcasm, but no Texas court has addressed the categorization of parody/satire or its role in First Amendment speech. *See, e.g., Musser v. Smith Protective Servs.,* 723 S.W.2d 653, 655 (Tex.1987) (addressing specific language in an unsolicited letter to a potential client and noting that it was "sarcastic and may perhaps be twisted ... to imply Musser was unethical," but concluding statement was not untrue and was not defamatory); *Granada Biosciences, Inc. v. Barrett,* 958 S.W.2d 215,

## A. Free Speech and Defamation

 The First Amendment to the United States Constitution provides, in relevant part, "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. CONST. amend. I. Likewise, article I, section 8 of the Texas Constitution states, "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." TEX. CONST. art. I, § 8. The tort of defamation creates an exception to these broad guarantees. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974); *see also Cain v. Hearst Corp.*, 878 S.W.2d 577, 582 (Tex.1994) (noting that "[e]very defamation action that the law permits necessarily inhibits free speech"). "The legitimate state interest underlying the law of [defamation] is the compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz*, 418 U.S. at 341, 94 S.Ct. at 3008. The tension between allowing free political speech and protecting public officials and figures from defamation has particular importance in this case as it is undisputed that both Isaacks and Whitten are public officials and were the targets of the *Dallas Observer'*s article.

 Libel is a defamatory statement expressed in written or other graphic form tending to injure one's reputation, thereby exposing the person to public hatred, contempt, ridicule, or financial injury. TEX. CIV. PRAC. & REM.CODE ANN. § 73.001 (Vernon 1997). Despite this broad definition, a defamatory expression is not actionable under the First Amendment unless the statement is one of false fact. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 768–69, 106 S.Ct. 1558, 1559, 89 L.Ed.2d 783 (1986); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–20, 110 S.Ct. 2695, 2705–06, 111 L.Ed.2d 1 (1990) (holding falsity must be based upon whether the statement carries a "provably false factual connotation"). Likewise, Texas courts have recognized that, under the First Amendment, public officials and public figures must prove, as an essential element of defamation that a publication makes a false statement of fact. *See Musser*, 723 S.W.2d at 655 (noting that, in order to prove defamation, public figures and officials must initially prove the publication makes a false statement of fact); *Fort Worth Star–Telegram v. Street*, 61 S.W.3d 704, 709 (Tex.App.-Fort Worth 2001, no pet.) (same); *Brewer v. Capital Cities/ABC, Inc.*, 986 S.W.2d 636, 642 (Tex. App.-Fort Worth 1998, no pet.) (same). To recover for defamation, public officials such as Isaacks and Whitten must also establish that the defendant's publication of a false and defamatory statement was made with actual malice. *Huckabee*, 19 S.W.3d at 420; *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998), *cert. denied*, 526 U.S. 1051, 119 S.Ct. 1358, 143 L.Ed.2d 519 (1999); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989).

 Falsity "for constitutional purposes [depends upon] the meaning a reasonable person would attribute to a publication, and not on a technical analysis of each individual statement." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 116 (Tex.2000). Whether a publication makes a statement of fact that is false and defamatory depends upon a reasonable person's perception of the entirety of the publica-

223 (Tex.App.-Amarillo 1997, pet. denied) (noting distinction between torts of libel and business disparagement and addressing defendant's claim that statements made were meant to be sarcastic).

tion, not merely on individual statements. *Milkovich,* 497 U.S. at 18, 110 S.Ct. at 2695 (holding that what plaintiff must prove false is not literal phrase but "what a reasonable reader would have understood the author to have said"); *Bentley v. Bunton,* 45 Tex. Sup.Ct. J. 1172, 1182, 94 S.W.3d 561, 579 (2002), *Turner,* 38 S.W.3d at 116; *see also Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 511, 111 S.Ct. 2419, 2430, 115 L.Ed.2d 447 (1991) (noting that a quotation, taken out of context, can "distort" meaning).

▆▆▆▆ Whether words used are reasonably capable of defamatory meaning is initially a question of law for the trial court. *Bentley,* 45 Tex. Sup Ct. J. at 1182, and n. 44, 94 S.W.3d at 561, and n. 44; *Turner,* 38 S.W.3d at 114; *Musser,* 723 S.W.2d at 655. The court must construe the allegedly defamatory publication as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive it. *Turner,* 38 S.W.3d at 114; *Musser,* 723 S.W.2d at 655; *accord Milkovich,* 497 U.S. at 24, 110 S.Ct. at 2709 (Brennan, J., dissenting) (noting factors relied upon by majority to distinguish fact from opinion were same as those of lower courts: type of language used, meaning of statement in context, whether statement is verifiable, and broader social circumstances in which it is made). When a publication is of ambiguous or doubtful import the jury must determine its meaning. *Turner,* 38 S.W.3d at 114; *Musser,* 723 S.W.2d at 655.

### B. Satire and Parody

Satire, particularly realistic satire, is defined as a distortion of the familiar with the pretense of reality in order to convey an underlying critical message. *See* Leslie Kim Treiger, Note, *Protecting Satire Against Libel Claims: A New Reading of the First Amendment's Opinion Privilege,*

98 YALE L.J. 1215, 1219 (1989) (noting lack of protection under case law for "realistic satire" based on the *New York Times* actual malice test). "Satire ... can be identified ... by the methods it employs; whether in the form of irony, sarcasm or parody, it is usually humorous, and uses shocking and cruel language." *Id.* at 1230–31 (citing G. HIGHET, THE ANATOMY OF SATIRE 5 (1962)). By its very nature, satire employs the use of rhetorical forms in which appearance and reality are in constant flux. *Id.*

Parody, a synonym for caricature, is defined as "a form or situation showing imitation that is faithful to a degree but that is weak, ridiculous, or distorted." WEBSTER'S THIRD NEW INT'L DICTIONARY 1643 (Philip Babcock Gove, Ph.D., ed.1981). In the arena of political debate, "Parodies and caricatures are the most penetrating of criticisms." Geri J. Yonover, *Artistic Parody The Precarious Balance: Moral Rights, Parody, and Fair Use,* 14 CARDOZO ARTS & ENT. L.J. 79, 80 (1996) (quoting Aldous Huxley). Despite their sometimes caustic nature, parodies, in the form of cartoons, in particular, have played a prominent role in public and political debate throughout American history. *Hustler Magazine v. Falwell,* 485 U.S. 46, 54, 108 S.Ct. 876, 881, 99 L.Ed.2d 41 (1988).

Satire and parody are among the proven and recognized tools utilized by writers to illustrate a political point. Writers often use satire and parody to humble political leaders and public figures. Glenn J. Blumstein, *Nine Characters in Search of an Author: The Supreme Court's Approach to "Falsity" in Defamation and its Implications for Fiction,* 3 UCLA ENT. L.REV. 1, 38 n. 165 (1995). "[By] their nature, satire and caricature are acerbic and 'often calculated to injure the feelings of the subject of the portrayal.'" *James R. Laguzza, Note, Hustler Magazine, Inc. v. Falwell: Laugh*

*or Cry, Public Figures Must Learn to Live with Satirical Criticism,* 16 PEPP. L.REV. 97, 107 (1988) (quoting *Hustler,* 485 U.S. at 54, 108 S.Ct. at 881–82). It is well recognized that both parody and satire are important components of public debate. *Id.* at 55, 108 S.Ct. at 881.

## C. Testing the Publication for Assertions of Fact

■ In determining whether a statement is defamatory, our first inquiry is whether the article conveys false statements of fact. *Milkovich,* 497 U.S. at 16, 110 S.Ct. at 2704; *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 284, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745 (1974). If, as the *Dallas Observer* contends, the objected to portions of the article are mere expressions of opinion or rhetorical hyperbole, they are not false statements of fact.[5] The United States Supreme Court has held that opinion, rhetorical hyperbole, and other expressions of loose, figurative speech are generally not actionable because they do not state actual facts. *See, e.g., Letter Carriers,* 418 U.S. at 284–86, 94 S.Ct. at 2781–82 (deciding that the use of the word "traitor" in the definition of the word "scab" was not a basis of defamation because the language was loose, figurative, or hyperbolic).

■ However, the meaning of a publication, and thus whether it is false and defamatory, depends upon how a person of ordinary intelligence would perceive the publication. *Turner,* 38 S.W.3d at 114;

*Musser,* 723 S.W.2d at 655. Statements of opinion or rhetorical hyperbole are protected by the First Amendment if a reasonable reader would understand that they do not state an actual fact. *See, e.g., Hustler,* 485 U.S. at 50, 108 S.Ct. at 879 (holding parody of Jerry Falwell was not believable to the average reader and therefore not actionable defamation); *Greenbelt Coop. Publ'g Ass'n v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6 (1970) (concluding no reasonable reader would have thought the term "blackmail" used in heated debate was literal accusation of crime); *A.H. Belo Corp. v. Rayzor,* 644 S.W.2d 71, 80 (Tex.App.-Fort Worth 1982, writ ref'd n.r.e.) (following *Bresler* decision and holding use of term "blackmail" was protected by First Amendment as "no more than rhetorical hyperbole").

Texas decisions predating *Milkovich* indicated that all statements of opinion were protected.[6] In *Milkovich,* however, the Supreme Court rejected the proposition that the First Amendment protects all statements of opinion concerning matters of public concern. 497 U.S. at 18–20, 110 S.Ct. at 2705–06. Instead, the Court held that falsity for constitutional purposes must be determined by whether a statement carries a "provably false factual connotation." *Id.* The Court specifically recognized the *"Bresler–Letter Carriers-[Hustler]* line of cases" as retaining protection for statements that cannot "reasonably [be] interpreted as stating actual facts." *Id.* at 20, 110 S.Ct. at 2706 (quoting *Hustler,* 485 U.S. at 50, 108 S.Ct. at

---

5. Rhetorical hyperbole is "extravagant exaggeration employed for rhetorical effect." *Am. Broad. Co. v. Gill,* 6 S.W.3d 19, 30 (Tex.App.-San Antonio 1999, pet. denied).

6. *See, e.g., Carr,* 776 S.W.2d at 570 (stating, "[a]ll assertions of opinion are protected by the [F]irst [A]mendment...."); *Howell v. Hecht,* 821 S.W.2d 627, 631 (Tex.App.-Dallas 1991, writ denied) (same); *Brewer,* 986

S.W.2d at 643 (categorically stating, "an opinion cannot form the basis of a defamation action"); *see also Yiamouyiannis v. Thompson,* 764 S.W.2d 338, 340 (Tex.App.-San Antonio 1988, writ denied) (holding distinction between opinion and fact elevated to constitutional status), *cert. denied,* 493 U.S. 1021, 110 S.Ct. 722, 107 L.Ed.2d 742 (1990).

879). This recognition, the court posited, "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Id.*

In *Turner*, the Supreme Court of Texas not only confirmed the significance of *Milkovich* as limiting the constitutional protection for statements of opinion to those that do not imply false fact, but additionally recognized that, under *Milkovich,* courts must determine falsity for constitutional purposes based upon the meaning a reasonable person would attribute to a publication *as a whole* and not on a technical analysis of each individual statement. 38 S.W.3d at 116. In *Bentley*, a majority of the court further articulated the *Milkovich* analysis as focusing on (1) a statement's verifiability, and (2) the entire context in which it was made. *Bentley,* 45 Tex. Sup. Ct. J. at 1183.

In *Turner*, Sylvester Turner, a mayoral candidate, sued Wayne Dolcefino, a reporter, and KTRK Television for libel. *Turner,* 38 S.W.3d at 109. Dolcefino authored a news report that questioned whether Turner was involved in a multi-million dollar insurance scam in which a person faked their own death. *Id.* at 111. After a jury awarded both actual and punitive damages, the Fourteenth Court of Appeals reversed and rendered. *Id.* The supreme court's focus in *Turner* was on how to address a television news story that made true statements framed in such a manner as to create a misleading impression on the viewer. *Id.* at 113.[7]

■■■ Analogizing to statements of opinion that may nevertheless become actionable under *Milkovich* if they carry a "provably false factual connotation," the supreme court in *Turner* held that a publication may also, by omission or juxtaposition, "connote false facts even though it does not state them directly." *Id.* at 116. As the *Turner* court noted, a quotation cited out of context may distort meaning even though the speaker used each repeated word. *Id.* In the same way, "failing to place facts in their proper context can change the meaning of an event." *Id.* We believe that the situation in *Turner,* i.e., omission or juxtaposition of true facts so as to create a substantially false impression, is sufficiently analogous that its standard can be adopted here. Thus, the threshold issue here becomes whether the publication, offered as realistic satire or parody, constitutes merely imaginative expression of opinion or rhetorical hyperbole or is so misleading as to convey a substantially false and defamatory impression. We hold that satire or parody that conveys a substantially false and defamatory impression is not protected under the First Amendment as mere opinion or rhetorical hyperbole, but instead is subject to scrutiny as to whether it makes a statement of fact under defamation case law.

### D. Satire and Parody Case Law

Our holding is supported by cases that have addressed defamation claims arising out of satire and parody. The *Dallas Observer* relies on several cases and commentators to support its position that the "Stop the Madness" article is nonactionable opinion or rhetorical hyperbole. Because these cases are factually distinguishable, we are unpersuaded. The *Dallas Observer* initially cites *San Francisco Bay Guardian, Inc. v. Superior Court* as an example of a newspaper parody that did not amount to a statement of actual fact. 17 Cal.App.4th 655, 21 Cal.Rptr.2d 464, 466–67 (Cal.Ct.App.1993). In *Bay Guard-*

7. The court, while concluding that omissions in the story created a false impression, ultimately held that there was no evidence of actual malice. *Id.* at 121–22.

*ian,* the newspaper printed a parody in its April Fool's edition in the form of a letter to the editor signed by a fictionalized person. *Id.* at 465. After examining the article in the "totality of circumstances," the court determined that the letter was not defamatory because the average reader would recognize the April Fool's issue as a parody, rather than presenting false facts. *Id.* at 467. The court pointed out that the newspaper informed readers in its table of contents that the April Fool's edition of the paper had a "special parody section." *Id.* at 466. The special parody section was printed on the back of the paper and could only be read when turned upside down. *Id.* For further comedic effect, the Bay Guardian had a comment in that section, stating: "Copies of all unsigned letters will be sent to the Federal Bureau of Investigation for cross-checking. In case of accident, we will notify next of kin." *Id.* These were obvious clues to the average reader, absent here, that the letter to the editor in Bay Guardian was a parody.

The *Dallas Observer* next turns our attention to *Pring v. Penthouse International,* 695 F.2d 438 (10th Cir.1982). *Pring* arose out of a fictional story in *Penthouse* about the misadventures of "Charlene," a Miss Wyoming at the Miss America contest. *Id.* at 439. In *Pring,* the author described the fictional Ms. Wyoming's talent for both baton twirling and certain oral sexual acts. *Id.* at 441. The court held that "it was readily apparent, with the extended description of thoughts of Charlene and other indications, that [the article] was all fanciful and did not purport to be a factual account." *Id.* The court also noted that "We have impossibility and fantasy within a fanciful story." *Id.* Essentially the court concluded that, because the story could not happen, it could not be taken literally; therefore, any defamatory statements could not reasonably be understood as statements of fact. *Id.* at 443.

In contrast with the article in *Pring,* the "Stop the Madness" article was not of an impossible nature, but came out one week after a minor had actually been arrested for making an alleged terroristic threat in a homework assignment. In light of several years of media attention on violence in public schools, and the correlative facts between the Beamon incident and the "Stop the Madness" story, a reasonable reader could find this story to be believable. Further, the article here was located in the "News" section of the paper and attributed believable quotes to public officials, referred to by their real names, who had been involved in the preceding Beamon incident.

The *Dallas Observer* also attempts to analogize this case to the Ninth Circuit's decision in *Dworkin v. Hustler Magazine, Inc.,* 867 F.2d 1188 (9th Cir.1989). Andrea Dworkin, a known feminist vehemently opposed to pornography, was referred to by *Hustler Magazine* repeatedly in a series of graphic sexually explicit cartoons. *Id.* at 1191. The *Dworkin* court held that no reasonable reader would conclude that the caricatures and depictions of Dworkin made actual statements of fact. *Id.* The court reasoned, "[l]udicrous statements are much less insidious and debilitating than falsities that bear the ring of truth." *Id.* at 1194.

In *Dworkin,* readers had clear and distinct clues that the caricatures (drawings) and captioning were not relaying any statement of actual fact. *Id.* Here, the *Dallas Observer* did not utilize a caricature or drawing nor did it attempt to make the article obviously ludicrous. Rather, it utilized the photograph of a little girl to add realism to the article. The *Dallas Observer* provided no obvious clues to the average reader that the article was not conveying statements of actual fact.

Another case relied upon by the *Dallas Observer* is the Supreme Court case of *Hustler*, 485 U.S. at 49, 108 S.Ct. at 878. In *Hustler*, the Supreme Court directly addressed the question of whether a publication labeled a parody constituted rhetorical hyperbole or made an actual statement of fact. In that case, the Court had to determine whether a parody of an advertisement for Compari Liqueur featuring the name and picture of nationally known minister Jerry Falwell constituted actionable defamation or protected parody and therefore presented a question for the jury. *Id.* The fake advertisement involving Falwell had a disclaimer printed at the bottom of the page in small print: "ad parody—not to be taken seriously." *Id.* In *Hustler*, the jury found against Falwell on his libel claim in finding that the *Hustler* parody ad "could not reasonably be understood as describing actual facts ... or ... events" in which Falwell participated. *Id.* The Supreme Court granted certiorari on the issue of whether the "outrageous" nature of the article could serve as the basis for damages for emotional distress. *Id.* at 50, 108 S.Ct. at 879. The Court held, "public figures and public officials may not recover for the tort of intentional infliction of emotional distress ... without showing in addition [to the outrageous nature of the publication] that the publication contains a false statement of fact...." *Id.* at 56, 108 S.Ct. at 882. *Hustler* confirms that the same standard applies for determining whether a parody or satire constitutes protected speech as for determining whether any other type of statement is actionable under the First Amendment. *Id.*

As discussed above, in every case relied upon by the *Dallas Observer* in which a court found parody or satire to be nonactionable, the reader was given obvious clues that the piece was not conveying statements of actual fact. Because each piece could not be taken literally, the various courts held that the publications were subject to First Amendment protection and were not actionable as defamatory. However, as illustrated above, if an attempted satire or parody fails to make clear to its readers that it is not conveying actual facts, it may be defamatory. RE-STATEMENT (SECOND) OF TORTS § 566, cmt. d, at 176 (1977); *see also Hoppe v. Hearst Corp.*, 53 Wash.App. 668, 770 P.2d 203, 206 (1989) (adopting the Restatement (Second) of Torts section 566).

### E. Application of Law to Facts

The *Dallas Observer* maintains that the "Stop the Madness" article provided the average reader ample notice that it was a satire when read in its entirety. To demonstrate its point, the *Dallas Observer* brings several specific sections of the article to our attention. The *Dallas Observer* first addresses the following quote that it attributed to Whitten:

"Any implication of violence in a school situation, even if it was just contained in a first-grader's book report, is reason enough for panic and overreaction," Whitten said from the bench. "It's time for you to grow up, young lady, and it's time for us to stop treating kids like children."

The *Dallas Observer* contends that the context of that purported quote obviously brings to the attention of the reader that it was attributed to Judge Whitten in jest and was the very essence of parody. Next, the *Dallas Observer* examines a statement it attributed to Isaacks: " 'We've considered having her certified to stand trial as an adult, but even in Texas there are some limits,' Isaacks said." The *Dallas Observer* insists that the only reasonable interpretation of the statement is that it was a component of fictional satire. The *Dallas Observer* points to other elements of the article as evidence that the

article clearly signals to the reader that it was satirical in nature:

> Sources say courthouse security officers ordered the shackles after they reviewed [Cindy's] school disciplinary record, which included reprimands for spraying a boy with pineapple juice and sitting on her feet.
>
> Welch also confirmed reports that school representatives will soon join several local faith-based organizations, including God–Fearing Opponents of Freedom (GOOF), and ask publishers to review the content guidelines for children's books.
>
> "Parents must understand that zero tolerance means just that," [Gov. George W. Bush] said. "We won't tolerate anything."
>
> Cindy scoffed at the suggestion that *Where the Wild Things Are* can corrupt young minds. "Like, I'm sure," she said. "It's bad enough people think like Salinger and Twain are dangerous, but Sendak? Give me a break, for Christ's sake. Excuse my French."

Isaacks and Whitten respond that the author's use of quotes throughout the entire article, along with the use of the photograph of the alleged offending child and the fact that the article was in the "News" section with no disclaimer, are indicia from which a reasonable reader would conclude that the article purported to assert statements of actual fact.

■ Isaacks and Whitten also point to the article's use of fictionalized quotations attributed to relevant individuals who would likely make some kind of statement in this situation as significantly adding to the realism of the article. The Supreme Court has recognized that "quotations may be a devastating instrument for conveying false meaning." *Masson*, 501 U.S. at 517, 111 S.Ct. at 2433. Here, quotes are attributed to the bailiff, the presiding judge, the district attorney, former Governor George W. Bush, and a representative of the ACLU. A reasonable reader could conclude that these were the appropriate people to comment on this issue and that their quoted comments were real. Moreover, the use of the photograph and the use of quotes for fictional statements are not the only article is both indexed and published as the lead story under the heading of "News" in a section ordinarily devoted to hard-hitting investigative news. Alongside the article there is a column noting that the article's author had recently won a Katie Award for best general news story, thereby adding credence to her credentials as a news reporter. Additionally, the article interweaves references to an actual incident in which a minor from the same city was detained for a terroristic threat stemming from a homework assignment no less than a week prior to this article's publication. Further, the *Dallas Observer* fails to provide any kind of disclaimer or note to the reader that the article was a parody or satire.

■ After examining the evidence in the light most favorable to the non-movants, we hold there is evidence raising a genuine issue of material fact that the "Stop the Madness" article fails to provide any notice to a reasonable reader that it was a satire or parody and that a reasonable reader could conclude that the article made statements of fact. Accordingly, the trial court did not err in denying the *Dallas Observer*'s motion for summary judgment. The *Dallas Observer* failed to establish as a matter of law that a reasonable person would perceive or understand that the publication did not make false statements of actual fact concerning Isaacks and Whitten. We overrule the *Dallas Observer*'s second issue.

## VII. APPLICATION OF ACTUAL MALICE STANDARD TO POLITICAL SATIRE AND PARODY

In its third and fourth issues, the *Dallas Observer* argues that the trial court erred in denying its motions for both traditional and no-evidence summary judgment regarding actual malice. In the defamation context, actual malice is a term of art. It does not include ill-will, spite, or evil motive. *Huckabee*, 19 S.W.3d at 420; *Casso*, 776 S.W.2d at 558; *Street*, 61 S.W.3d at 709. As discussed above, "actual malice is the making of a statement with knowledge that it is false or with reckless disregard as to its truth." *Street*, 61 S.W.3d at 709 (citing *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 710). To establish reckless disregard, a public official or public figure must show that the publisher "entertained serious doubts as to the truth of [its] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *accord Huckabee*, 19 S.W.3d at 420; *Street*, 61 S.W.3d at 709.

It was not until 1964, in *New York Times, Inc. v. Sullivan*, that the Supreme Court decided that the First Amendment placed limits on the law of defamation by prohibiting public officials from recovering damages for false statements concerning official conduct absent proof of actual malice.[8] 376 U.S. at 279–80, 84 S.Ct. at 725. Since that time, the Court has consistently reiterated that the fundamental importance of the unbridled flow of ideas and opinions on matters of public interest and concern is at the very heart of the First Amendment. *Masson*, 501 U.S. at 510, 111 S.Ct. at 2429; *Hustler*, 485 U.S. at 50, 108 S.Ct. at 879; *Letter Carriers*, 418 U.S. at 273, 94 S.Ct. at 2776. With an eye on protecting the unbridled flow of ideas, the Supreme Court has defined actual malice as the publisher's knowledge that a statement was false or made with reckless disregard for whether it was true or false. *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 725.

Thus, a public official or figure may hold a speaker liable for damaging his reputation through publication of a defamatory falsehood only if that statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.; accord Hustler*, 485 U.S. at 52, 108 S.Ct. at 880. The rationale is that false statements of fact about these figures have no constitutional value. *Gertz*, 418 U.S. at 340, 94 S.Ct. at 3007. Despite the lack of protection afforded defamatory falsehoods, they are unavoidable in public debate, and to "impose strict liability on a publisher for false factual assertions would have an undoubted 'chilling' effect on speech relating to public figures that does have constitutional value." *Hustler*, 485 U.S. at 52, 108 S.Ct. at 880.

The *Dallas Observer* argues, however, that the *traditional* actual malice standard does not apply to satire or parody. Instead, it advocates a modified actual malice standard employing the use of "the subjective intent to pass off falsity as fact." Proper application of the actual malice standard to asserted satire or parody in a defamation action by public officials is one of first impression in Texas.

### A. The Actual Malice Standard

The *Dallas Observer* proposes that, in order to conclusively disprove actual malice, the traditional standard must be altered because of the peculiar nature of

---

8. The actual malice limitation on defamation recovery by public officials was later extended to "public figures" in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967).

satire and parody as fiction. It reasons that, because satire and parody are intentionally fictional, neither of those literary devices can successfully overcome the traditional actual malice test, which asks whether the defendant had knowledge that a statement was false or recklessly disregarded whether it was true. In other words, under the traditional test, all satire and parody would be regarded as intentionally false and, therefore, published with actual malice. Thus, the *Dallas Observer* proposes that the test for asserted satire and parody must be whether the defendant subjectively intended for readers to believe that the fiction was fact. Under its no-evidence motion, the *Dallas Observer* argues that Isaacks and Whitten must come forward with evidence that it intended for readers to believe the fiction was fact.

■ The constitutional test for actual malice is a subjective test that examines the author's state of mind regarding whether he or she knew a statement was false or made with reckless disregard for its truth. *Hustler,* 485 U.S. at 52, 108 S.Ct. at 880; *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325; *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 725; *Huckabee,* 19 S.W.3d at 420; *Street,* 61 S.W.3d at 709. We disagree that the actual malice test should be altered to require subjective intent to portray fiction as fact in cases involving asserted satire or parody. We believe that the *Dallas Observer's* proposed substitute test improperly raises the level of culpability and, hence, the burden of a plaintiff, from "knowing or reckless disregard" to that of intent to mislead or deceive.

In support of its proposed new test, the *Dallas Observer* references case law from various jurisdictions and commentators who have discussed the application of the traditional *New York Times* actual malice

test to satire or parody. The *Dallas Observer* first cites *Dworkin,* 867 F.2d at 1194. While *Dworkin* acknowledges the apparent inconsistency of inquiring into the existence of the author's knowledge or reckless disregard of falsity in a case of admitted fiction, it does not support the *Dallas Observer's* proposed test. The court in *Dworkin* concluded that, "if a speaker knowingly publishes a literally untrue statement without holding the statement out as true, he may still lack subjective knowledge or recklessness as to the falsification of a statement of fact required by *New York Times." Id. Dworkin* supports the idea that actual malice is not established simply because a statement is untrue and held out as untrue for the reasonable reader, such as in the context of satire. However, we disagree that *Dworkin* substitutes subjective intent to mislead for knowledge of or reckless disregard for falsity as the level of culpability for *New York Times* actual malice.

The *Dallas Observer* also relies upon the conclusion in *Hoppe* that the *New York Times* actual malice standard cannot be applied where the alleged defamatory expression at issue is satire, humor, or fiction, because "in any such work, it is likely the author did not intend the work to be completely truthful." 770 P.2d at 208. According to the *Hoppe* court, "a different standard has been developed for determining malice in these situations, namely: whether the author intended or recklessly failed to anticipate that readers would construe the publication as a statement of defamatory facts." *Id.* The *Dallas Observer* admits, however, that the *Hoppe* court misstated the second half of the *New York Times* actual malice test.

■ Finally, the *Dallas Observer* incorrectly cites the recent opinion of the Supreme Court of Texas in *Turner* as holding that actual malice inquires into

what the defendant subjectively intended the reader to perceive. To the contrary, the supreme court held in *Turner* that, to establish actual malice, a public figure must only "present ... evidence that the defendant *knew or strongly suspected* that the publication as a whole could present a false and defamatory impression of events." 38 S.W.3d at 120 (emphasis added) (citing *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1256 (9th Cir.1997) (holding actual malice requires that defendants know language is misleading)); *see also Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 680 (9th Cir.1990) (concluding defendant must know language choice was misleading); *Huckabee*, 19 S.W.3d at 426 (explaining defendant must know that omission could create substantially false impression). This case is similar to *Turner* in that the same basic issue exists here: Did the publisher either know or strongly suspect that the article was misleading or presented a substantially false impression? We believe the traditional test for actual malice, as articulated in *Turner*, remains both adequate and appropriate in this case.

## Application to "Stop the Madness" Article

■ Because Isaacks and Whitten must prove actual malice in order to prevail at trial, the *Dallas Observer* is entitled to summary judgment as to any statement on which it can negate actual malice as a matter of law. *Casso*, 776 S.W.2d at 555. The *Dallas Observer* relies on the affidavits of Farley, Williams, and Lyons to disprove actual malice. Farley was the author of the article in question. Williams was the managing editor of the news section, and Lyons was the editor in chief of the *Dallas Observer* at the relevant time. In response, Isaacks and Whitten rely upon deposition testimony of these Appel-

lants that was before the court at the time of summary judgment.

Farley's affidavit outlines her thoughts in constructing the article and concludes with an express denial of her subjective intent for readers to accept the article as conveying actual statements of fact. Her affidavit states, in relevant part:

> With regard to the November 11 article's description of the fictional events surrounding the fictional 6–year–old girl Cindy Bradley, I never intended that the description of the incident be taken as an account of an actual event. My intent was that the article would, by its content, indicate to the reasonable average reader that it was a satire commenting on the overreaction of public officials in the Christopher Beamon case. I believed that reasonable readers would know that the "Cindy Bradley" incident was fictional, and I never entertained any doubt that reasonable readers would know that the "Cindy Bradley" incident was fictional. I did not believe that I was publishing anything false that purported to be a statement of fact with regard to the article's description of the "Cindy Bradley" incident. I neither knew nor believed that the account of the "Cindy Bradley" incident would likely be understood as stating actual historical fact.

Farley's affidavit further noted, "I had the idea to write something for the *Dallas Observer* that would be a takeoff or satire of the Beamon incident." Farley explained:

> I discussed with Patrick [Williams] whether or not we wanted the story to be a "prank" intended to fool readers, or whether the story should be outrageous enough that the readers would be let in on the joke and could tell that the events described were fictional. We agreed that we did not want the story to be a

prank, but rather that it should be constructed so that readers would be attracted to it and then would clearly be signaled that the article was a satire or parody.

The *Dallas Observer* also relies on the Williams affidavit in its effort to negate actual malice. Williams's affidavit indicates that he did additional editing of the "Stop the Madness" piece in an effort to make the article "funnier." Williams also denies any intent to knowingly make false statements of fact or act with reckless disregard for the truth. He likewise states:

> My intent was that the November 11, 1999 article would show the absurdity and high-handedness of the action taken in the Chris Beamon case by carrying it to its logical extreme and to ridicule the panicked reaction of adults to children's behavior in the wake of several episodes of random school violence.

Finally, the *Dallas Observer* relies upon the Lyons affidavit in its attempt to negate actual malice. Lyons's affidavit states that the initial draft needed to be more humorous and more obviously a satire and that she assigned the editing task to Williams. Lyons explicitly denies actual malice with the exact general denial that both Farley and Williams used. Lyons also states, "The intent of the November 11, 1999 article was to make a satirical political comment on some Denton officials' decision to put Chris Beamon in jail because of an objectionable homework assignment. There was no intent that the story of 'Cindy Bradley' be taken as stating actual historical fact."

 Much of what is presented in the above-discussed affidavits about the affiants' beliefs concerning how the article would be perceived is conclusory and is therefore not competent summary judgment evidence. *See In re Am. Home*

*Prods. Corp.*, 985 S.W.2d 68, 74 (Tex.1998) (orig.proceeding) (op. on reh'g) (holding that conclusory, uncontroverted opinions and testimony about an issue have no probative value and do not raise a fact issue); *Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex.1991) (holding that conclusory statements by an expert witness are insufficient to support summary judgment). More importantly, our summary judgment rule allows the granting of a summary judgment based on uncontroverted testimonial evidence of an interested witness only if the evidence "is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." *Casso*, 776 S.W.2d at 558 (citing Tex.R. Civ. P. 166a(c)). The affidavits of Farley, Williams and Lyons, are controverted by their deposition testimony.

For example, Farley admitted the article was intended to hold Isaacks and Whitten up to public ridicule. Her ideas came from published accounts of the Beamon matter. She thought the public officials overreacted to the Beamon matter and believed that Beamon should never have been detained, but she did no investigation into the handling of the Beamon case. She never intended a straight news story. She never interviewed Isaacks and Whitten and admitted quotes attributed to them were untrue. She denied the story was false, but admitted it was "fictional."

Williams admitted in his deposition that he wrote a response in the "Buzz" column, calling readers who believed the report "cerebrally challenged" and "clueless." He admitted he never considered the possibility that someone might not be able to tell that the article was fictional satire. He also agreed the article was meant as satire or scathing commentary, and that it could be harmful to Isaacks's and Whitten's reputations.

Lyons, who was responsible for the *Dallas Observer's* overall editorial policy, agreed that no one investigated the Beamon incident. She never considered labeling the article as parody or satire. She later realized that some readers thought that it was real and she changed the heading of the on-line version to "Satire." Lyons agreed that the story would hold these public officials up to public ridicule. Most significantly, Lyons agreed that, in this instance, even intelligent, well-read people could have been misled by the story, and some were.

■ The summary judgment evidence leads us to conclude that, in light of the *New York Times* standard as applied in *Turner*, there is evidence raising a genuine issue of material fact that the *Dallas Observer* knew or strongly suspected that the article could be misleading. Therefore, there is evidence that the *Dallas Observer* knew or strongly suspected that when they published the article it was false and defamatory. *See Turner,* 38 S.W.3d at 116; *Huckabee,* 19 S.W.3d at 424. Consequently, we overrule the *Dallas Observer's* third and fourth issues. Having overruled the *Dallas Observer's* second through fourth issues, we overrule their first issue, which was their general complaint that the trial court erred in denying its motions for summary judgment. *Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970).

### VI. MOTION FOR ATTORNEY'S FEES AND COSTS

■ By a motion filed after our original opinion was issued, Appellees contend that section 51.015 of the Texas Civil Practice and Remedies Code requires that, since we are affirming the trial court's judgment, we must order the *Dallas Observer* to pay attorney's fees and costs of this interlocutory appeal. We agree and grant Appellees' motion. Section 51.015 provides:

Costs of Appeal

■ In the case of an appeal brought pursuant to Section 51.014(6), if the order appealed from is affirmed, the court of appeals shall order the appellant to pay all costs and reasonable attorney fees of the appeal; otherwise, each party shall be liable for and taxed its own costs of the appeal.

TEX. CIV. PRAC. & REM.CODE ANN. § 51.015 (Vernon 1997). The terms of this statute are mandatory. *Gaylord Broad. Co.,* 7 S.W.3d at 286 (holding court of appeals was required to order media defendant to pay plaintiff's costs and attorney's fees on appeal by defendant where appellate court affirmed trial court's order denying summary judgment); *see also KTRK Television, Inc. v. Fowkes,* 981 S.W.2d 779, 785 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) (holding statute constitutional). Appellants must therefore pay all costs and reasonable attorney's fees of this appeal.

### V. CONCLUSION

Having held that genuine issues of material fact exist regarding whether the *Dallas Observer's* article made false statements of fact and was published with actual malice, we affirm the trial court's order denying the *Dallas Observer's* motions for summary judgment. We remand to the trial court for a determination of the costs and reasonable attorney's fees of these appeals.